(No. 7244.   June 26, 1945.)

LENUS L. ANDERSON, Respondent, v. HERMAN RU-
BERG, Appellant.

[160 Pac. (2d) 456.]

J. H. Felton for appellant.

Earle W. Morgan for respondent.

BUDGE, J.—Substantially the following facts are disclosed by the record:

Respondent and Clara Anderson, now deceased, married in 1936; they moved to Clarkston, Washington, where they resided until Mrs. Anderson's death in 1942. Following her death respondent caused her estate to be probated in Asotin County, Washington. In the proceedings had in the probating of decedent's estate the promissory note, on which this action was brought, was distributed to respondent. There is no dispute between the parties with reference to the execution and delivery of the note by appellant to his mother. At the trial appellant testified that in the spring of 1941 he and his sister, Mrs. Selma Neyens, visited at the home of his mother and respondent, where a conversation was had with the mother with reference to the note; that at the time of this conversation his mother, his sister and he were present. In answer to the following questions appellant made the following answers:

"Q. What did your mother do about the note at that time, * * *?

"A. In 1941?

"Q. Yes.

"A. Well, she handed the note back to me.

"Q. What did you do with it?

"A. I thought I put it in my pocket.

* * * *

"Q. Did you have it when you got home?

"A. No.

"Q. The fact that you missed it was communicated to your mother?

"A. Yes, it was.

"Q. Do you know whether or not, of your own knowledge, a search was made for that note in the house at Clarkston?

"A. Yes.

"Q. Do you know whether you looked in the safe?

"A. Yes.

"Q. Was it in the safe?

"A. No.

"Q. When did you next hear about this note after April, 1941?

"A. After my mother's death.

"Q. How long after her death?

"A. A couple of hours.

"Q. Was Mr. Anderson there?

"A. Yes, he was.

"Q. And what was said there then?

"A. He said that now I can sell the Randall Flat place and collect the notes."

On cross-examination appellant testified as follows:

"Q. Did you ask Mr. Anderson for the note?

"A. No, I did not.

"Q. It was within five minutes (after appellant arrived at his mother's home) he (Anderson) told you about selling the land, * * *

"A. Yes.

"Q. When did you next see it (the note) ?

"A. This is the first time.

"Q. You knew about her estate being probated?

"A. Yes.

"Q. You were advised of the existence of this note at that time?

"A. Yes.

"Q. Did you ever pay anything to your mother for this note?

"A. Never did.

"Q. Did you pay anything to Mr. Anderson?

"A. No, never did."

Appellant being recalled on direct examination, testified:

"Q. Herman, do you remember having a conversation with your mother down at Clarkston in the house down there some time in May or June, 1941?

"A. Yes, I did.

"Q. Who were present at that time?

"A. My mother, my sister, and myself.

"Q. What did your mother tell you about the note at that time?

"A. She told me I never had to; she didn't want the money.

"Q. What did she do with the note?

"A. She handed the note back to me.

"Q. What did she tell you?

"A. She told me she didn't want any payment from that note *in her lifetime, unless she needed it.*

"Q. And then you went down there and she told you you didn't need to pay it at all?

"A. That's right."

On further cross-examination appellant testified:

"Q. When you looked in the safe at the time you did look in the safe * * * were there any pouches in there, a note pouch:

"A. I don't know. I kinda think there was.

"A. Did you look in that?

"A. No, I don't think I did."

Mrs. Selma Neyens, appellant's sister, testified on direct examination:

"Q. Did your mother talk over with you the question of this note?

"A. Yes.

"Q. Were you down there when your mother and Herman had a conversation about this note?

"A. Yes, I should judge in May or June.

"Q. Will you give that conversation?

"A. He said he had made arrangements to pay for this note and my mother said, no, she had never intended to have him pay the money, but she wanted to give it as a gift, and then she went and got this note and handed it to my brother * * * Well, then she handed him the note and she said she never planned on him paying this. * * * she said, *If I ever need help I can go to you.*

"Q. * * * did you hear anything about the note?

"A. Yes, we did.

"Q. When was this?

"A. Oh, it was in about 1942 and then it was lost.

"Q. Did you and your mother try to find it?

"A. Yes.

"Q. What search did you make?

"A. Through the safe and different places she thought it could have been.

"Q. Could you find it?

"A. No.

"Q. Did you or your mother, or either of you, inquire of Mr. Anderson as to the whereabouts of the note?

"A. Yes."

It might be observed here that appellant testified that he did not ask Anderson for the note, neither did his mother, in his presence, nor did his sister.

Respondent, in rebuttal, testified in part as follows:

"Q. Do you remember as a fact when your wife died? * * *

"A. Oh, yes, yes.

"Q. Was Herman there at the time she died?

A. He came, yes, like he said he did.

"Q. At that time did you tell him: 'Now my wife is dead and I can sell the Randall Flat'?

"A. I didn't talk about anything like that, oh, no, I had the respect for my wife and I didn't do anything like that.

"Q. Now, at that time, did you say, 'Now I can collect on the notes'?

"A. I didn't say that either because she was loving her boy Herman more than any of the children, and I didn't push collection of the note.

"Q. * * * did you, within two hours of the time your wife died, while she was in the next room, and when Herman and Mrs. Neyens were present, say: 'Now I can sell the Randall Flat and now I can collect on the notes'?

"A. No, that's a lie.

"Q. Did you ever say such a thing?

"A. No.

"Q. Did you ever say such a thing to Herman?

"A. No.

"Q. Did you ever say such a thing to Mrs. Neyens?

"A. No.

"Q. Did you ever say such a thing to anyone else not there present?

"A. No, I didn't.

"Q. You had a safe in your house?

"A. Yes, a safe, yes.

"Q. Did you ever see Plaintiff's Exhibit 1 in Evidence (the note) in that safe?

"A. Well, I don't see good now, but that is his signature and that was there because my wife put it there.

"Q. Did you see it there?

"A. I saw it there some time.

"Q. Was it in a container in the safe?

"A. There was two boxes, drawers like there be in the bank, two drawers, and there was papers in both of them.

"Q. Was this (note) in any kind of pouch?

"A. The notes were in the pouch.

"Q. Tell us, if you know, whether this (note) was in the safe at all times until your wife died?

"A. I never knew anything else.

"Q. Was it in your safe after she died, for a time?

"A. Yes, it was. We took it up."

Mrs. Neyens testified, on cross-examination, that there was a safe in the pantry; that her mother went and got the note out of the safe, and handed it to her brother. Appellant testified that he and his mother searched for the note in the safe but did not look in the note pouch. An examination of the note discloses that it is in the same condition as when delivered by appellant to his mother.

At the conclusion of the trial the jury returned a verdict

in favor of respondent. Judgment was entered on the verdict, from which this appeal is prosecuted.

Appellant relies for a reversal upon four assignments of error. If we are correct in the conclusion we have reached, we need consider only three of the assignments.

The first assignment of error is predicated upon the action of the court "in refusing to grant a judgment of non-suit against the plaintiff or direct a verdict in favor of the defendant at the close of all of the evidence for the reason that the positive, uncontradicted testimony of Mrs. Neyens and Mr. Ruberg showed that Mrs. Anderson, the holder, had expressly renounced her rights against appellant after the maturity of the note, * * *"

It might be proper here to call attention to the fact that appellant in his notice of appeal, "appeals to the Supreme Court of the State of Idaho from that certain 'Judgment on Verdict' dated the 16th day of December, 1944, * * * and from that certain 'Order Denying Motion for Judgment Notwithstanding Verdict' dated the 16th day of January, 1945, * * * and from all of the judgments in this cause and from all of the orders denying motion for judgment notwithstanding verdict. This appeal is taken from the whole of said judgment or judgments and order or orders, and from each and every part thereof."

As was said in *Cady v. Keller*, 28 Ida. 368, 154 P. 629:

"Sec. 4807, Rev. Codes, (sec. 11-201, I.C.A.) fixes the time within which appeals may be taken from judgments and certain orders made and entered in district courts to this court, but no provision is made for an appeal from an order denying a motion for judgment notwithstanding the verdict, and, in the absence of such provision, it is not an appealable order. This will, therefore, be treated as an appeal from the judgment alone."

Hence, we will consider this an appeal from the judgment alone.

The first point sought to be made by appellant is that the positive, uncontradicted testimony of Mrs. Neyens and Mr. Ruberg showed that Mrs. Anderson, before the maturity of the note, expressly renounced the debt and delivered

the note to appellant under the provisions of sec. 26-804, I.C.A., which provides:

"The holder may expressly renounce his rights against any party to the instrument before, at, or after its maturity. An absolute and unconditional renunciation of his rights against the principal debtor made at or after the maturity of the instrument discharges the instrument. * * * A renunciation must be in writing, unless the instrument is delivered up to the person primarily liable thereon." Consequently no recovery could be had. There is no contention made that there was a renunciation in writing.

We are first confronted with the question of whether the evidence is sufficient to establish an absolute and unconditional renunciation of the debt within the meaning of sec. 26-804, supra, and, second, whether the testimony of the witnesses, appellant and his sister, as to what their mother said to them, heretofore recited, was admissible, being hearsay.

Conceding, but not deciding, since there is respectable authority holding that such statements are admissible under varying circumstances, that the testimony as to what deceased said to appellant and his sister is admissible, we still have the general rule that statements of persons since deceased are always to be regarded with caution. (*Eaton v. New York L. Ins. Co.*, 315 Pa. 68, 172 A. 121, 95 A.L.R. 462.)

The mere fact that the evidence—consisting entirely of admissions, and what is worse, of the admissions of a person since deceased, and who hence cannot contradict the witness—neither can the witness be otherwise contradicted, is perhaps the weakest species of evidence, and subject to greater suspicion when dealt with by the trier of the fact, who must determine its credibility, the credibility of the witness being exclusively a question for the jury. (Sec. 16-201, I.C.A.)

Mrs. Neyens merely testified that when the deceased handed her brother the note she, the deceased, said she never planned on him (appellant) paying it, and she said, "If I ever need help I can go to you." Appellant testified that his mother said she didn't want any payment from that note in her lifetime, unless she needed it. Whereupon

counsel for appellant, by a leading and suggestive question couched in the following language, asked: "And then you went down there and she told you you didn't need to pay it at all," to which appellant answered, "That's right."

In the light of the foregoing testimony elicited from appellant and his sister, coupled with the language of the statute, sec. 26-804, supra, the jury was justified in the exercise of caution in accepting or rejecting the statements of appellant and his sister as to what their mother said, in determining whether an absolute and unconditional renunciation of the debt had actually been made.

Every material fact offered in evidence, other than the testimony as to what the mother is alleged to have said to appellant and his sister, is categorically denied by respondent. We are not constrained to hold that the positive, uncontradicted testimony of appellant and his sister established the fact that the deceased had, prior to her death, expressly, absolutely and unconditionally renounced the debt, though not controverted, entitled appellant to judgment in his favor. Neither are we inclined to hold that the uncontradicted testimony of the above named witnesses established the delivery of the note by the deceased to appellant. The rule contended for by appellant, however, requires an examination of all the facts and circumstances in testing the reliability of the testimony of appellant and Mrs. Neyens touching the renunciation and delivery of the note.

Summarizing the evidence as a whole, it appears there is no denial of the execution and delivery of the note by appellant to deceased; the note was in the same physical condition when introduced at the trial as it was when delivered to deceased; the note was placed in a note pouch by deceased and the pouch was placed in the safe, and was seen there by respondent, therefore, deceased knew where the note was. The note was found in the note pouch in the safe by respondent and by him delivered up to the court of probate, and distributed to respondent, who became the owner thereof. Appellant had notice of the probate proceedings and the existence of the note. Neither appellant, his sister, nor the deceased, as appears from appellant's testimony, examined the note pouch in the safe in an effort to locate the note. No written evidence of

any kind, after discovery of the loss of the note as testified to by appellant, passed between appellant and his mother. No statements were ever made by appellant or deceased to anyone, other than between themselves and Mrs. Neyens, that the note had been lost, although appellant testified they knew it had been lost. Appellant made no inquiry of respondent about the note, nor in any manner intimated to anyone in any way the nature of his defense to defeat payment of the note until appellant filed his answer.

The burden rested upon appellant to establish by a preponderance of the evidence absolute renunciation of the debt, coupled with the delivery of the note to him by his mother during her lifetime.

We think the questions, whether or not the debt was renounced, and whether or not the note was delivered to appellant within the terms of the statute, are questions of fact for the jury to determine from all the evidence and surrounding circumstances developed upon the trial. The jury heard all the testimony, observed the demeanor of the witnesses while testifying, their interest or lack of interest in the outcome of the litigation, and concluded by their verdict that appellant had not met the burden of proof required or necessary to establish the fact of renunciation of the debt or delivery of the note to appellant by his mother. (*Davenport v. Burke*, 30 Ida. 599 at 604, 167 P. 481; *Duthweiler v. Hanson*, 54 Ida. 46 at 54, 28 P. (2d) 210.)

Appellant urges the court erred in giving instruction No. 6, especially in saying that "you are not bound to accept the testimony of any witness as true, whether the witness be directly contradicted by other testimony or not," for the reason that the court and jury must accept as true the positive, uncontradicted testimony of a credible witness, unless such testimony is inherently improbable. Said instruction, when applied to the facts and circumstances disclosed by the record and considered in connection with the instructions as a whole, does not constitute prejudicial error. (*Pierstorff v. Gray's Auto Shop*, 58 Ida. 438, 74 P. (2d) 171; *First Trust & Sav. Bank v. Randall*, 59 Ida. 705, 89 P. (2d) 741; *Gray v. Fraser*, 63 Ida. 552, 123 P. (2d) 711.) If testimony is inherently improbable, or rendered improbable by facts and circumstances, it may

be disregarded by the jury even though it be uncontradicted and positive, and from a credible witness. If the jury believed that the testimony of appellant and his sister as to what deceased said, or whether she said anything or not, or whether she delivered the note, was inherently improbable, or rendered improbable by facts and circumstances, the jury was at liberty to disbelieve such testimony. In other words, if any circumstances appearing in the case would justify a reasonable man in disregarding the statements of a witness, the jury may refuse to believe such statements, even though not directly challenged. (*Pierstorff v. Gray's Auto Shop,* supra.)

Appellant makes the further contention that the court erred in entering judgment on the verdict for the reason that the obligation was payable in gold coin, and that any payment in gold coin is contrary to law.

True, the note contains a provision that it is payable in gold coin of the United States, but it does not follow that the note is void and unenforceable. Moreover, there is no merit in this contention. We quote 31 U.S.C.A., 463 (a) which is self-explanatory:

"Every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. *Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of the payment is legal tender for public and private debts.* * * *"* (emphasis ours). (*Norman v. Baltimore & O. R. Co.,* 294 U.S. 240, 79 L. ed. 885; *Nortz v. United States,* 294 U.S. 317, 79 L. ed. 907; *Perry v. United States,* 294 U.S. 330, 79 L. ed. 912; *Holyoke Water Power Co. v. American Writing Paper Co.,* 300 U.S. 324, 81 L. ed. 678.)

The obligation was subject to discharge by the payment of lawful money in any coin or currency which was legal tender for the payment of public or private debts. Respond-

ent did not seek to recover payment in gold coin, but for the principal sum of $1000, with legal interest.

It follows from what has been said that the judgment must be affirmed, and it is so ordered, with costs to respondent.

Ailshie, C.J., and Givens, Holden and Miller, JJ., concur.