644 P.2d 1333

Herbert L. RUETH and Kathleen J. Rueth, Husband and wife, Plaintiffs-Respondents,

v.

The STATE of Idaho, Robert G. Kalb, Paul Keeton, John Eaton, Jack Hemingway, and H. Jack Alvord, as Commissioners of the Idaho Fish and Game Commission, Joseph C. Greenley, Director of the Idaho Fish and Game Department, Defendants-Appellants.

No. 13650.

Supreme Court of Idaho.

April 30, 1982.

David H. Leroy, Atty. Gen., Lynn E. Thomas, Sol. Gen., John C. Vehlow, David J. Barber and Stephen V. Goddard, Deputy Attys. Gen., Boise, for defendants-appellants.

Peter J. Boyd of Elam, Burke, Jeppesen, Evans & Boyd, Boise, for plaintiffs-respondents.

McFADDEN, Justice.

Herbert and Kathleen Rueth brought an inverse condemnation action against the Idaho Fish and Game Department. The action arises out of the Department's operation of a water diversion structure, which allegedly caused the water table on the Rueths' property to be raised so that their land has been flooded from subsurface percolation, "effect[ing] a complete loss of value of said lands of plaintiffs and, therefore, constitutes a taking of said lands of plaintiffs by defendants." The district court entered judgment on a jury verdict in favor of the Rueths on their inverse condemnation action, and the Department appealed. On appeal, the judgment is affirmed.

*Background*

Herbert and Kathleen Rueth operated a dairy farm on 18.2 acres of land in Canyon County. The acreage formed a rectangular area through which, on the west side, from south to north, flowed a slough variously known as the Rueth drain and the Weilmunster drain. Most of the dairy farm, including all of the improvements and roadways were located to the east of that drain. A small area of pasture was located to the west of the drain.

The Rueth dairy farm had previously been a portion of a much larger ranch known as the "Hansen Ranch" from the 1940's to the early 1960's. At that time the property was owned by Jim Hansen, who had maintained a large cattle feeding operation on or near the Rueth property and on the portion of his ranch immediately across the Rueth drain. Hansen moved off the property in the early 1960's. In 1962 the dairy on the Rueth property was constructed by Bruce Brahs. Subsequently, Don Weilmunster purchased the property, and in 1967 took on the Rueths as partners. They dissolved the partnership in 1968. At approximately that time Weilmunster sold the bulk of the ranch to the Idaho Fish and Game Department for inclusion in the Fort Boise Wildlife Management Area. The dairy was not included in the sale.

The principal waterway "downstream" from the Rueth property is Sand Hollow Creek. It carries water from irrigated uplands of the Black Canyon Irrigation Project to its confluence with the Snake River at the Fort Boise Wildlife Management Area. Although probably a natural waterway at one time, it is now principally an agricultural drainage way. It carries a very substantial sedimentation load because of its nature as an agricultural drainway.

In 1951, Jim Hansen constructed an irrigation check structure or dam across the creek in the vicinity of the Rueth property. The structure was designed so that the water level behind it could be raised by the insertion of a series of boards. The boards are placed in the structure, one on top of the other, until the desired height of water behind it is reached. The structure is approximately five feet high at its maximum. The original method of irrigating from waters captured behind the structure was

simple. Hansen and his successors would check the water up by the insertion of boards when they needed to irrigate. They would bring the water to a height sufficient to permit them to pump from the backwater. Once they were finished irrigating, after a period of a few days to a week, they would remove the boards and allow Sand Hollow Creek to run freely again through the structure. Although some sediment would build up as siltation behind the structure while the boards were in, the short duration during which the water was impounded and the immediate rush of the creek would allow that sediment to be cleared away.

Not long after acquiring the property, the Fish and Game Department ceased to follow the irrigation practice which Hansen had initiated and which had been followed by Brahs and Weilmunster. Instead of periodically checking water up only high enough and long enough to permit pump irrigation, the Department changed the location of the irrigation ditch involved, built wild fowl ponds, and by 1970 or 1971, had begun checking the water up to the full height of the dam year around. The check structure was now used to flow water into the ditch by gravity both to irrigate farm land and to fill and maintain wild fowl areas. The use of irrigation pumps had been abandoned.

Beginning with the winter of 1971–72, the Rueths and their neighbors began to notice a significant deterioration of the groundwater condition on their property. By 1972, the westernmost of the feedlots on the Rueth's dairy farm was virtually filled with standing water and rendered useless. Subsequently, by the end of 1974, the Rueth's feedlots on the east side of the Rueth drainage were inundated with the groundwater.

*Proceedings Below*

The instant case is a sequel to *Rueth v. State*, 100 Idaho 203, 596 P.2d 75 (1979) (Rueth I). There the State Fish and Game Department appealed a jury verdict in fa-

vor of the Rueths on their inverse condemnation claim against the state. In reversing and remanding, the court held *inter alia* that submission to the jury of the question of taking was error.

Thereafter, the Rueths immediately sought a new trial on their original claim that the Fish and Game Department's operation of the irrigation check structure on Sand Hollow Creek and resultant flooding by way of subsurface percolation of their dairy farm "effected a complete loss of value of said lands of plaintiffs and, therefore, constitutes a taking of said lands of plaintiffs by defendants." The Fish and Game Department denied the taking and denied any responsibility for the alleged flooding.

After the trial date was set, the Department responded with a series of procedural motions for a bifurcation and a vacation of the trial setting. The district court denied these motions and the action came on regularly for trial on December 10, 1979.

The district court judge chose to impanel the jury at the outset of the evidence in order that it might be fully apprised of all of the circumstances relevant to any possible damages determination which it might have to make. However, consistent with *Rueth I*, the district judge sat as the sole finder of facts on the question of whether or not a taking had occurred.

On December 17, 1979, following an extended trial, the district court entered its memorandum decision on the issue of taking. The district court expressly stated that the decision constituted its findings of fact and conclusions of law. I.R.C.P. 52(a). In the decision, the court found: (1) Sand Hollow Creek carries a heavy sediment load constantly; (2) the Department altered the operation of the check structure after acquiring it and blocked Sand Hollow Creek for much longer periods of time than previous owners did; (3) the extended operation of the check structure caused widening of the stream channel, flattening of the stream gradient, reduction of water velocity

and advancement of sedimentation; (4) the change in channel geometry was an effective proximate cause of the ground water table raising around the Rueth property; (5) the raising ground water table caused substantial impairment of the Rueths' property interest in the operation of their dairy farm; (6) the full extent of such impairment was realized on or about October 4, 1974, and (7) the management practices of the Rueths did not constitute a contributing cause of the water damage on their property. On the basis of these findings, the court further found and concluded "that the State of Idaho did, as of October 4, 1974, take that portion of plaintiffs' property lying east and northeast of the Rueth drain, and that plaintiffs are entitled to just compensation for that taking."

The case was then submitted to the previously impaneled jury for determination of just compensation. The jury returned a verdict in the sum of $145,000, and judgment issued thereon.

Thereafter, the Idaho Fish and Game Department perfected the instant appeal.

The Fish and Game Department presents eight issues on appeal. A careful review of these eight issues and the arguments advanced in support thereof disclose that many of the issues challenge the sufficiency of the evidence supporting the district court's findings of fact. Summarily, the factual issues are whether the following findings of fact are supported by competent and substantial evidence: (1) that the Department's operation of the irrigation check structure constituted a "substantial cause" of the Rueths' loss of use of their property; (2) the management practices of the Rueths did not constitute a contributing cause of the water damage suffered by the Rueths; and (3) the taking occurred on or before October 4, 1974. These factual issues shall be treated in a consolidated manner and discussed at the outset. The remaining issues presented on appeal are whether the district court erred in denying the Department's motion to bifurcate the trial and

refusing to act upon the Department's motion to view the premises.

*Sufficiency of Evidence*

I.R.C.P. 52(a) provides in pertinent part:

"In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon and direct the entry of the appropriate judgment .... Findings of fact shall not be set aside unless clearly erroneous. In the application of this principle regard shall be given to the special opportunity of the trial court to judge the credibility of those witnesses who appear personally before it.... If an opinion or memorandum decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.... A written memorandum decision issued by the court may constitute the findings of fact and conclusions of law only if the decision expressly so stated or if it is thereafter adopted as the findings of fact and conclusions of law by order of the court."

Under this rule of procedure, a trial court's findings of fact will be liberally construed in favor of the judgment entered, and on appeal, the findings of fact will not be disturbed unless clearly erroneous. *Javernick v. Smith*, 101 Idaho 104, 609 P.2d 171 (1980); *Roemer v. Green Pastures Farms, Inc.*, 97 Idaho 591, 548 P.2d 857 (1976). As the court stated in *Watkins v. Watkins*, 76 Idaho 316, 325, 281 P.2d 1057, 1062 (1955), upon appellate review, the findings of fact of the trial court will be accepted if they are supported by "substantial, competent though conflicting evidence, however meager." This standard of appellate review is salutory in effect, and reflects the view that deference must be afforded to the special opportunity to assess and weigh the credibility of the witnesses who appear before it personally. *Jensen v. Bledsoe*, 100 Idaho 84, 593 P.2d 988 (1979).

The Department contends that the district court erred in finding that the Depart-

ment's operation of the irrigation check structure constituted a "substantial cause" of the damage to the Rueth's property, for the reason that the Rueths did not carry their burden of proof forward; and moreover, for the reason that there is an absence of any evidence to show causation.

 Mr. Sherl Chapman, a registered professional geologist and water resource consultant, testified on behalf of the Rueths. His testimony was based upon investigations from early 1975 through 1979 to determine the cause of the water problems on the Rueths' property. Chapman's investigations included measuring velocity and sediment depth in Sand Hollow Creek, installing observation wells to determine the fluctuation of ground water level, and measuring stream width and sediment composition. Based upon these investigations, it was Chapman's opinion that the Department's operation of the check structure caused sedimentation in the stream bed of Sand Hollow Creek, flattening the gradient and displacing water upward. He further opined that as a result ground water drainage into the creek was obstructed, causing the water table to rise in that area to the point of waterlogging the Rueth property.

The Department asserts that the testimony is inherently improbable because of omissions within Chapman's investigation, i.e., failure to compute backwater curves to determine the effect the operation of the check structure had on Sand Hollow Creek, failure to take field measurements on the creek when the boards from the check structure had been removed, and failure to study the effect of flows or water levels in the Boise River on the ground water levels of the Rueths' property. In contrast, the Department's expert witness, Mr. Keith Anderson, an engineering geologist and water resource consultant, made such studies, and based on those studies, concluded that the cause of the ground water problems on the Rueth property resulted from flood flows in the Boise River and an above-normal level of precipitation.

Relevant to the issue of causation, the Department further argues that the Rueths' management practices, or lack thereof, constituted a contributing cause to the asserted damage. As to this argument, attention is drawn to the testimony of Dr. Jim Milligan, an associate professor of civil engineering at the University of Idaho. Acknowledging that the Rueth dairy farm site is definitely one which would present ground water problems, Dr. Milligan stated that those problems were nevertheless solvable. He further observed that the Rueths' management practices were unsound in alleviating ground water problems where those problems are the result of high water tables and above normal levels of precipitation.

The Department's argument overlooks the fact that weighing the testimony of expert witnesses is uniquely within the competence of the trier of fact. *Watkins v. Watkins, supra; Anderson v. Ruberg,* 66 Idaho 417, 160 P.2d 456 (1945). Moreover, the argument overlooks the well established rule that the opinion of an expert is not binding on the trier of fact, and provided that the trier of fact does not act arbitrarily, it may be rejected, even where uncontradicted. *Simpson v. Johnson,* 100 Idaho 357, 597 P.2d 600 (1979). *Roemer v. Green Pastures Farms, Inc.,* 97 Idaho 591, 548 P.2d 857 (1976); *State v. Blair,* 91 Idaho 137, 417 P.2d 217 (1966). In this case, the district court's decision not to follow Anderson's testimony completely, although disappointing to the Department, does not render its findings of fact clearly erroneous. Simply stated, each side's expert presented differing opinions to the district court based on differing methodologies, and it was within the sound discretion of the district court to accept or reject each expert's opinions.

Additionally, although the Department contends otherwise, Dr. Milligan's testimony was contradicted by three witnesses with extensive backgrounds in feedlot and/or dairy operations: Gary Rohwer, a feedlot and dairy consultant, Guy Freeman,

a dairy cattle broker, and Don Weilmunster, a cattle and feedlot operator for over twenty years. All three testified that they had the opportunity to view the Rueths' operation of the dairy farm over several years, and based on their individual backgrounds and experience, the management practices of the Rueths were consonant with the accepted practices in the dairy and feedlot businesses.

■ The final factual issue to be considered is whether the district court's finding that the full extent of the taking was realized on or before October 4, 1974 is supported by substantial and competent evidence.

In *Tibbs v. City of Sandpoint,* 100 Idaho 667, 603 P.2d 1001 (1979), the court recognized that the district court had to fix a date of taking in inverse condemnation cases, even if that task was difficult because the impairment was gradual in nature. The court then set forth the following standard for determining the time of taking in inverse condemnation actions:

"The actual date of taking, although not readily susceptible to exact determination, is to be fixed at the point in time at which the impairment, of such a degree and kind as to constitute a substantial interference with plaintiffs' property interest, became apparent." 100 Idaho at 671, 603 P.2d at 1005.

Under this standard, it cannot be said that the date of October 4, 1974, as the date of the taking, is unsupported by the evidence. On that date the Rueths and the Director of the Department met in Boise, and agreed that until a solution could be found for the problem, the boards would be removed from the irrigation check structure. The evidence reveals no appreciable improvement in the silted condition of the creek or in the waterlogged condition of the Rueth property after October of 1974. Sherl Chapman testified that he went on the property in the spring of 1975 and found it inundated by surface ground water. Prior to 1974, the Rueths testified that the condition grew gradually worse, engulfing year by year more and more of their property, rendering it unusable after 1974. The Rueths' testimony was corroborated by their neighbors. Because of the gradual nature of the taking in this case, and because of the character of a taking through a rising groundwater table, it would have been impossible to pick a specific date on which it could be said clearly that the taking occurred. Nonetheless, the agreement of the Department of October 4, 1974, to remove the boards from the irrigation check structure represents a recognition of the severity of the problem, and the evidence supports this date as a reasonable one for purposes of fixing the date of actual taking.

In summary, the district court's findings of fact relative to the factual issues of causation and the date of taking are supported by substantial and competent, although conflicting, evidence. And suffice it to say, the same rule applies to the other issues presented on appeal incidental to the question of the sufficiency of the evidence.

*Bifurcation of Issues in Trial*

■ The Department next argues that the district court committed reversible error in not bifurcating the issues involved in this case between the taking issue and the damage issue. In support of this argument, the Department cites to *Rueth I, supra,* wherein it was stated:

"In close cases, the trial courts may conclude it to be preferable to bifurcate the issues, with the court upon determining the taking issue then providing an accurate description of the property or right therein which has been taken. Such a procedure would save litigants the unnecessary expense of expert witness fees and trial time were all issues submitted in one trial and the taking issue then resolved adversely to the property owner." 100 Idaho at 223, 596 P.2d at 95.

The Department asserts that persuasive reasons existed for bifurcation in this case.

First, the date of the taking was a matter subject to much dispute at trial. The jury could easily be confused by the testimony in the taking portion of the trial. Second, the jury was required to sit through five days of testimony primarily irrelevant to the issue they would decide. Third, the amount of duplication of effort required by a bifurcated trial in an inverse condemnation action is minimal. We disagree.

In *Rueth I*, far from compelling a bifurcation, the court left the decision to bifurcate the issues involved in the trial to the sound discretion of the trial court. 100 Idaho at 222, 596 P.2d at 94. Consonant with this view is I.R.C.P. 42(b), which reposes the issue of bifurcation in the discretion of the trial court.[1]

In the instant case it cannot be said that the trial court abused its discretion in denying the appellants motion for bifurcation. The manner in which the taking had occurred was subtle and complex. The uses to which the property was put, its location, its size, and its character were all involved in the issue of whether or not a taking had occurred and the issue of damages in the event a taking was found. If no jury had been impaneled until after the trial court had determined whether or not a taking had occurred, a significant period of time would have had to have elapsed between the bifurcated halves of the action. Moreover, the damages portion of the case would have required duplication of proof concerning the land, what had happened to it, what it had been used for, its size, its location, and its character.

*Motion to View*

■ The Department's final issue presented on appeal relates to its motion filed on November 6, 1979, for a viewing by the district court. The district court never

acted on the motion, and it is asserted that the district court abused its discretion in not viewing the property involved in this case. The assertion is without merit.

In *Lobdell v. State*, 89 Idaho 559, 568, 407 P.2d 135, 140 (1965), an inverse condemnation action, the court reiterated the well settled rule that views are discretionary, and that views are not evidentiary in nature but rather a means of assisting the trier of fact in its weighing of the evidence.

"A view or inspection of the character under consideration is permissible for the purpose of enabling the court properly to understand the evidence, and properly to apply it. A view may be considered as bearing on the credibility of the witnesses who appeared at the trial. It cannot be considered as evidence or have the effect of supplying evidence independent of, or in addition to, that taken in the course of the trial, or supplant evidence adduced, or meet the requirement that proof of necessary facts be made." Quoting form 89 C.J.S. Trial § 588, at 369–370.

*See also*, G. Bell, Handbook of Evidence for the Idaho Lawyer 181–82 (2d ed. 1972); *Annot.*, "Right to View by Jury in Condemnation Proceedings," 77 A.L.R.2d 548 (1961). Moreover, the case law from other jurisdictions cautions that a view ought to be avoided unless the trial court is satisfied that the conditions of the premises are the same on the day of the view as they were at the time the matter arose and that a view is reasonably necessary to do justice. *See, e.g., Watson Lumber Co. v. Guennewig*, 79 Ill.App.2d 377, 226 N.E.2d 270 (1967); *Briggs v. Chicago Great Western Ry. Co.*, 243 Minn. 566, 68 N.W.2d 870 (1955).

Inasmuch as the district court never acted on the motion for a view, the court is not favored with an explanation as to why the district court deemed a view unnecessary.

---

1. I.R.C.P. 42(b) provides:
 "The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim, cross-claim, counterclaim, or third-party claim, or of any separate issue or of any number of claims, cross-claims, counterclaims, third-party claims, or issues, always preserving inviolate the right of trial by jury as declared by the Constitutions, statutes or rules of the court."

Nonetheless, in light of the lapse of time between the filing of the motion and when the matter arose, it cannot be said that the district court erred in not acting upon the motion.[2]

*Attorney's Fees on Appeal*

Finally, the Rueths request an award of reasonable attorney fees on appeal as the prevailing party. I.C. § 12–121, I.A.R. 41. In *Minich v. Gem State Developers, Inc.*, 99 Idaho 911, 918, 591 P.2d 1078, 1085 (1979), several general principles were stated for determining when such an award would be justified:

> "Since the statutory power is discretionary, attorney fees will not be awarded as a matter of right. Nor will attorney fees be awarded where the losing party brought the appeal in good faith and where a genuine issue of law was presented. In normal circumstances, attorney fees will only be awarded when this court is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably or without foundation."

In the instant case a dispassionate view of the record discloses there was no valid reason to anticipate reversal of the judgment below on the factual grounds urged. The record contains abundant evidence supporting the determination of the judge and jury. Similarly, the arguments and authorities advanced in support of the two legal issues presented on appeal failed to establish how the discretionary decisions of the district court not to bifurcate the issues involved in the trial or to act upon the motion for a view arose to the level of error.

Judgment affirmed. Costs and attorney fees on appeal to respondents.

BAKES, C. J., and DONALDSON and SHEPARD, JJ., concur.

---

**2.** It is to be noted that at the time the motion for a view was filed, the premises on the Rueth property had been vacated and the dairy operation disbanded for well over three years.

BISTLINE, J., concurs in affirming, and concurs specially in awarding attorney fees on appeal.

BISTLINE, Justice, concurring specially.

*Rueth I* in a way was a codification of the Court's previous opinions in inverse condemnation cases. Nothing said therein need be here repeated, but it should be referred to in order to understand my reasoning for an award of attorney's fees.

It would be difficult for me to make that award on the basis of the *Minich*[1] doctrine. I continue to believe that the Court in *Minich* erroneously and unconstitutionally applied I.C. § 12–121 and that the views expressed in the separate opinions of Bistline, J., and Donaldson, J., should have prevailed. Similarly, I have on occasion challenged the use of the Court's procedural rulemaking authority to modify the statute as it was made applicable to awards of attorney's fees in the trial courts. Nothing more need be added and I have heretofore vowed "to write no more forever" on that score.

My reading of the Court's carefully drawn opinion giving full discussion to the issues prevents my reaching an "abiding belief that appeal was brought, pursued or defended frivolously, unreasonably or without foundation." *Minich*, 99 Idaho at 918, 591 P.2d at 1085. The taking issue was twice resolved against the State, and the two juries were astonishingly close on damages. While I do believe there was little chance of success on the appeal, I thought, and still do, that there was *no* chance for a reversal in the case of *Lamb v. Robinson*, 101 Idaho 703, 620 P.2d 276 (1980). It was reversed, however, and on issues not raised.

Returning to the first paragraph above, *Rueth I* left it entirely clear that condemnation cases and inverse condemnation cases are not creatures of statute, but are civil actions predicated upon our Idaho constitution. Hence, we do not require, and need not submit to any legislative directions or prohibitions in pursuing our obligation to

---

**1.** *Minich v. Gem State Developers*, 99 Idaho 911, 598 P.2d 1078 (1979).

see that property owners receive the just compensation to which they are constitutionally entitled. Two-thirds of the amount of an award is not full compensation and, a fortiori, is not just. My vote to award attorney's fees on the appeal is so bottomed. I would have voted to sustain an award of attorney's fees at the trial level had any been awarded.