704 P.2d 950

Don **MERRILL** and Florence Merrill, husband and wife, Mary Thompson and Ferol Adams, Plaintiffs-Respondents-Cross Appellants,

v.

Paul **PENROD** and Alta Penrod, husband and wife, Defendants-Appellants-Cross Respondents.

**No. 14664.**

Court of Appeals of Idaho.

Aug. 1, 1985.

48

Roger D. Ling of Ling, Nielsen & Robinson, Rupert, for defendants-appellants-cross respondents.

D. Brent Martens of Hepworth, Nungester & Felton, Buhl, for plaintiffs-respondents-cross appellants.

## ON DENIAL OF PETITION FOR REHEARING

This opinion supersedes our prior opinions issued June 18 and July 17, 1985, which are hereby withdrawn.

SWANSTROM, Judge.

Water, that most precious of compounds, can be at once man's friend and his natural enemy. So it proved to be in this case, as neighbor turned against neighbor in the quest for harmony with nature. The plaintiffs, Don and Florence Merrill, Mary Thompson and Ferol Adams, brought this action to establish their rights to easements across the property of the defendants, Paul and Alta Penrod. The Merrills claimed easements for the purpose of diverting surface water and irrigation waste water from their property and Adams' property onto the Penrods' property. They also sought damages for injuries to their

land caused by the Penrods' interference with the man-made ditch used to divert this water and they requested an injunction to prevent further interference. Thompson claimed an easement over the Penrods' property for the purpose of receiving surface water and irrigation waste water from the Merrills' and Adams' properties. Adams further claimed easements to discharge surface water and irrigation waste water directly onto the Penrods' property. The district court, after a trial without a jury, granted easements to the Merrills and Adams, and awarded the Merrills damages and an injunction. The court also ordered the Merrills to maintain a dike on their property and ordered Adams to maintain a ditch on her property to reduce the water flowing onto the Penrods' land. The Penrods appealed and the plaintiffs cross-appealed. We affirm in part, vacate in part, and remand for further proceedings.

I

The facts, as found by the district court, are as follows. The Penrods own a parcel of land, approximately forty acres in size, located in Cassia County. The Merrills own a parcel of approximately thirty-seven acres, adjacent to and west of the Penrod parcel. An eighty-acre parcel owned by Adams, and farmed by her son Richard, is situated south of the Merrill and Penrod parcels and adjacent to both. Thompson owns an eleven-acre parcel to the northeast of and adjacent to the Penrod parcel. The Adams parcel has a higher elevation than the Merrill and Penrod parcels, and the Merrill parcel, in turn, has a slightly higher elevation than the Penrod parcel. As a result, water tends to flow generally northeast from the Adams parcel onto the Merrill and Penrod parcels, and from the Merrill parcel onto the Penrod parcel. The following sketch illustrates the layout of these properties.

All the parcels, except Thompson's, have decreed water rights and are irrigated with water from Marsh Creek. Water is diverted to the Merrill parcel from Marsh Creek into the Vaughn Canal, which then feeds a "community ditch" running along the southern border of their parcel. The ditch enters the Penrod parcel at its southwest corner and continues along the Penrods' southern border for some distance. It then

branches out to feed the entire Penrod parcel. Water run-off from the Adams parcel, both natural surface water and irrigation waste water, is collected in the community ditch on the Merrills' parcel and, together with the water diverted from the Vaughn Canal, finds its way to the Penrod parcel. The Penrod parcel also receives water run-off directly from the Adams parcel. This general state of affairs has existed for over twenty years. Finally, irrigation waste water flowed from the Merrill parcel onto the Penrod parcel across the common boundary between these parcels. After Penrod complained in 1977, the Merrills constructed an earthen dike to halt the flow. This measure was apparently successful, although in May 1981 water breached the dike and again flowed onto the Penrod parcel.

In December 1978, the Penrods decided that too much water was being discharged onto their land via the community ditch. To remedy this unhappy situation, they constructed a dirt dam at the point where the ditch entered their parcel. In January and February 1979, water in the ditch backed up behind the dam and overflowed the banks. The resultant flood covered approximately eight acres of the Merrills' pasture land. At this time, the Merrills were pasturing some 125 head of cattle. These cattle entered the flooded area. Because of the presence of the water and the cattle trampling in the mire, the hay crop for this eight acres in 1979 was reduced by half. A similar loss occurred the next year when the Penrods again dammed the community ditch.

In an effort to solve the problem Penrod complained of, i.e., excessive water draining from Adams' property directly or indirectly onto the Penrods' property, local irrigation district officials proposed to construct a drainage ditch on Adams' property. Adams consented to the work being done. On February 9, 1979, a drainage ditch was constructed at the northern boundary of the Adams parcel along the entire common boundary with the Penrods and partially along the common boundary with the Merrills. This was done to reduce

the flow of water from the Adams parcel into the community ditch and onto the Penrod parcel. The drain, in fact, reduced the flow by diverting some water back into Marsh creek. Two days later, Penrod removed the dam he had placed in the community ditch. During each of the following two winters, however, Penrod again dammed the community ditch to prevent any water from coming through the ditch onto his property during that time of the year when no one was irrigating. In 1981, the Merrills obviated the need for such a dam when they placed a headgate in the community ditch near the Merrill-Penrod boundary. This headgate now controls the flow of water, via the community ditch, to the Penrod parcel.

This action was filed in March 1981 by the Merrills, Adams and Thompson because of Penrod's refusal to accept the amount of water that was being discharged onto his property. Following trial, the district court issued its final findings of fact, conclusions of law and judgment. The court also denied the Penrods' motion for a new trial. From the facts recited the court concluded that: (1) Adams and the Merrills have an easement by prescription to discharge up to fifty miner's inches of irrigation waste water from the Adams parcel into the community ditch and thence across the Penrod parcel; (2) Adams and the Merrills have an easement by prescription to discharge surface water from the Adams parcel, through the community ditch, and across the Penrod parcel; (3) Adams has an easement by prescription to discharge up to fifty miner's inches of irrigation waste water directly onto the Penrod parcel; (4) Adams has a natural servitude for the purpose of draining surface water directly onto the Penrod parcel (this is not challenged on appeal); (5) the Penrods violated the easement in favor of the Merrills by constructing the dam, causing damages in the amount of $1,400; (6) Thompson failed to establish a right to an easement across the Penrod parcel; and (7) the Penrods failed to prove that damages resulted from the negligent discharge of irrigation water onto their parcel across

their common boundary with the Merrills. The district court also concluded that Adams should maintain the drainage ditch on her property and that the Merrills should maintain their dike. On appeal, the Penrods raise several issues, basically challenging the conclusion that prescriptive easements exist in favor of Adams and the Merrills, and the accuracy of the court's findings of fact. Adams, the Merrills and Thompson cross-appealed, also challenging certain findings and conclusions of the district court.

## II

We begin first with the district court's conclusion that Adams and the Merrills have prescriptive easements to discharge irrigation waste water from the Adams parcel into the community ditch where the water is collected and channeled onto the Penrod parcel.

> In a dry and arid climate, where irrigation is necessary in order to cultivate the soil, the question as to the rights of the proprietors of upper [dominant] and lower [servient] lands in regard to the waste water has seldom arisen, because, as a general rule, the lower landowner is willing to receive, dispose of, and profit by the use of all water flowing from the upper lands of another in irrigating his own land.

*Boynton v. Longley*, 19 Nev. 69, 6 P. 437, 438 (1885). What was true in 1885 is equally true today—seldom have servient landowners complained of too much water. Nevertheless, our Supreme Court has had occasion to hold that "an easement for the purpose of drainage across the land of another may be acquired by prescription." *Beasley v. Engstrom*, 31 Idaho 14, 18, 168 P. 1145, 1146 (1917).

To establish a prescriptive easement, the dominant landowner must "submit 'reasonably clear and convincing' proof of open, notorious, continuous, uninterrupted use, under a claim of right, with the knowledge of the owner of the servient tenement, for the prescriptive period." *West v. Smith*, 95 Idaho 550, 557, 511 P.2d 1326, 1333

(1973) (footnotes omitted). In order to constitute "continuous" use, the dominant landowner need not be "bodily on the land every minute." It is enough that "the frequency of use . . . is normal for the kind of easement claimed." R. CUNNINGHAM, W. STOEBUCK & D. WHITMAN, THE LAW OF PROPERTY § 8.7 at 455 (1984). In other words, intermittent use is enough if such would be the normal use. The use must also "constitute some actual invasion or infringement of the right of the [servient] owner." *Trunnell v. Ward*, 86 Idaho 555, 559, 389 P.2d 221, 223 (1964). Furthermore, if the use is with the permission of the servient landowner, no prescriptive easement can be acquired. In this though, the dominant landowner is aided by a presumption: "proof of open, notorious, continuous, uninterrupted use of the claimed right for the prescriptive period, without evidence as to how the use began, raises the presumption that the use was adverse [as opposed to permissive] and under a claim of right." *West v. Smith*, 95 Idaho at 557, 511 P.2d at 1333 (footnote omitted). The burden then falls upon the servient landowner to show that the use was permissive. *Id.*

### A

One of the Penrods' main contentions is that the prescriptive period does not begin to run until the servient land has been physically injured in some way. Citing *Loosli v. Heseman*, 66 Idaho 469, 162 P.2d 393 (1945), the Penrods argue that, although the dominant landowner makes use of the servient land for longer than the prescriptive period, he cannot acquire an easement if the land is never injured. They claim their land was not physically injured by excessive water until 1977. They contend that, because this action was brought in 1981, the five-year prescriptive period had not run. *See* I.C. §§ 5–203 and –206. We disagree.

In *Loosli*, the plaintiffs brought suit to quiet title to an alleged easement for drainage of irrigation waste water onto and across the defendant's land. The trial

court held that the plaintiffs had failed to establish an easement by prescription and they appealed. Our Supreme Court affirmed, quoting extensively from *Boynton v. Longley, supra.* Essentially, the court held that the mere acquiescence [1] of the servient landowner to small amounts of waste water flowing onto his land does not establish a prescriptive right to increase the flow to such a degree as to injure the land. Thus, while some water had flowed from the Loosli land onto the defendant's land, over his objections, for a number of years, the Looslis did not obtain a prescriptive easement to discharge irrigation waste water in such quantities as would injure the land.

■ Physical injury to the land, however, is not a condition precedent to the establishment of an easement by prescription. *Cf. Trunnell v. Ward, supra* (easement for a road over the servient land requires no physical injury to the land before the prescriptive period begins to run). *Trunnell* stands for the proposition that a servient landowner's rights may be invaded or infringed upon even in the absence of physical injury to the land. The court in *Loosli* stated: "Appellant failed to show to the satisfaction of the court and jury that he had continuously exercised the right of flowing the waste water upon respondent's land for the period of five years *without any substantial change.*" *Loosli v. Heseman,* 66 Idaho at 479, 162 P.2d at 397 (emphasis added) (quoting *Boynton v. Longley, supra* ). In other words, "[a] party claiming a prescriptive right for five years, who, within that time enlarges the use, cannot, at the end of that time claim the use *as enlarged* within that period." *Id.,* 162 P.2d at 441 (emphasis added) (quoting *Boynton v. Longley, supra* ). *Loosli,* therefore, should be understood to mean only that an easement does not include the right to *enlarge* the use to the injury of the servient land. An easement, of course, can be enlarged even to the extent that the servient land is injured, but the right to the enlarged use must also be established by

prescription, *i.e.,* by open, notorious and continuous use without any substantial change for the full prescriptive period, or by agreement with the servient landowner.

■ Turning to the case at hand, there is substantial, competent evidence to show that for over twenty years *some* irrigation waste water flowed from the Adams parcel into the community ditch on the Merrill parcel and thus onto the Penrod parcel. The evidence shows the use was open and continuous, but does not show it was permissive. The presumption that the use was adverse and under claim of right therefore comes into play. We can only conclude from this, as the district court did, that an easement by prescription was established for discharging irrigation waste water onto the Penrod parcel. The next question is the extent of that easement.

### B

■ It is incumbent upon the party claiming an easement by prescription to show the extent of that easement. *Loosli v. Heseman, supra.* "The right gained by prescription is always confined to the right as exercised for the full period of time required by statute." *Hall v. Taylor,* 57 Idaho 662, 669, 67 P.2d 901, 903 (1937) (quoting *Boynton v. Longley, supra* ). The right need only be exercised without *substantial* change for the prescriptive period. It does not need to be exercised without any change whatsoever. *See Loosli v. Heseman, supra.* The volume of irrigation waste water from the Adams parcel flowing onto the Penrod parcel via the community ditch was a matter of great controversy at trial. Substantial evidence was adduced which indicated that the flow varied between ten and fifty miner's inches from season to season and within each season over the twenty-year period before trial. The district court found that frequently up to fifty miner's inches of irrigation waste water flowed from the Adams parcel into the community ditch and thus onto the Penrod parcel. We will not set

---

1. "Acquiescene" is not synonymous with "permission." *West v. Smith, supra.*

aside this finding unless it is clearly erroneous. I.R.C.P. 52(a). Our examination of the record leads us to the conclusion that the court's finding as to the extent of this easement was *not* clearly erroneous.

The Penrods argue that no one could accurately estimate the flow of water in a ditch without utilizing some kind of measuring device. One witness so testified. Other witnesses, however, unequivocally stated that they *could* estimate the flow. We will not substitute our opinion for that of the district court on the relative credibility of the various witnesses. *See Erhardt v. Leonard,* 104 Idaho 197, 657 P.2d 494 (Ct.App.1983). Furthermore, the weighing of "the testimony of expert witnesses is uniquely within the competence of the trier of fact." *Rueth v. State,* 103 Idaho 74, 78, 644 P.2d 1333, 1337 (1982). Weighing all the testimony, the district court was satisfied that the flow of water could be and was accurately estimated. We will not second-guess that court on appeal.

The Penrods also voice concern over the effect of a quantity of water leaking from a wooden pipe on the Adams parcel. The owner of this pipe was some third party, not identified at trial. Apparently, the pipe was part of a system used by the owner to convey water across the Adams property to another location. For an indeterminate number of years, fifteen to twenty miner's inches of water had made its way to the Penrod parcel from this source. The leak was repaired in 1979. The Penrods argue that no easement for this escaping water had been established because none was claimed. They further contend that even if prescriptive easements had been established for surface water and irrigation waste water, such easements could not be enlarged by the water leaking from the pipe. Indeed, the proof submitted did not establish that *Adams* has acquired any prescriptive right to discharge this waste water upon Penrod. The evidence does not show for what period of time this water flowed from the pipe or when Adams began to assert any right to discharge this flow onto the Penrods' property. Nor did the evidence show that Adams permitted this water to flow onto the Penrods' property for the five-year prescriptive period. However, the fact remains that substantial, competent evidence was produced at trial to support the district court's conclusion that a prescriptive easement had been established for the discharge of up to fifty miner's inches of irrigation waste water onto the Penrod parcel via the community ditch. Thus, we hold that the prescriptive easement was not enlarged by the flow of water from the wooden pipe.

The district court also concluded that Adams had a prescriptive easement to discharge up to fifty miner's inches of irrigation waste water directly onto the Penrod parcel, in addition to the waste water flowing into the community ditch on the Merrill property. The Penrods' final challenge goes to this ruling. However, the record contains ample evidence to sustain the court's findings and conclusions on this issue.

### III

The second conclusion of the district court which is challenged on appeal is that Adams and the Merrills have an easement by prescription to accumulate surface water from the Adams parcel in the community ditch and discharge it onto the Penrod parcel. "An owner of lower property must accept the burden of surface water which naturally drains upon his land." *Smith v. King Creek Grazing Association,* 105 Idaho 644, 646, 671 P.2d 1107, 1109 (Ct.App.1983). *See also* Burnett, *Surface Water and Nuisance Law, A Proposed Synthesis,* 20 Idaho L.Rev. 185 (1984). This burden is called a natural servitude. However, a dominant landowner may not increase the burden upon servient lands by accumulating surface waters with man-made structures and discharging those accumulated waters, through an artifical channel, onto the lower lands. *See Dayley v. City of Burley,* 96 Idaho 101, 524 P.2d 1073 (1974) and *Teeter v. Nampa and Meridian Irrigation Dist.,* 19 Idaho 355, 114 P. 8 (1911). To attain

that right, he must establish an easement, by prescription or agreement, to discharge the altered flow.

◼ Here, the manner in which the surface water flowed from the Adams parcel to the Penrod parcel was altered by collecting it in the community ditch. The quantity was also increased because, if the man-made ditch had not existed, some of the water would have remained on the Merrill parcel. This situation, however, has existed for more than twenty years—well over the five-year prescriptive period. The elements necessary to establish a prescriptive easement have been satisfactorily proven; and, although the evidence regarding the extent of the use is again conflicting, we hold the district court's finding on this issue was not clearly erroneous. The court did not err in concluding that a prescriptive easement was established to discharge up to fifty miner's inches of surface water from the Adams parcel into the ditch and thus onto the Penrod parcel.

## IV

◼ Adams has cross-appealed to challenge one ruling of the district court. The court ordered Adams to maintain the drainage ditch which was constructed at the northern boundary of her parcel in order to reduce the flow of irrigation waste water and surface water onto the Penrod parcel. Adams argues that it is anomalous, on the one hand, to hold that she has a prescriptive easement to discharge water onto the Penrod parcel and, on the other hand, to hold that she must take steps to prevent this water from discharging onto the Penrod parcel.

The evidence shows, and the district court specifically found, that up to fifty miner's inches of irrigation waste water has been discharged onto the Penrod parcel for over twenty years. The court concluded, as noted above, that an easement had been established by prescription to discharge that water onto the parcel. However, the trial judge ordered Adams to "maintain the drain ditch ... to alleviate the amount of water that would go into the

Penrod property from Parcel 2 of the Adams property." This order is an apparent attempt by the court to couple the Adams' right to an easement with a duty to minimize the impact and burden of that easement upon the Penrods' use and enjoyment of their own property. Such a concept has been applied by courts of this state before, although not in respect to the particular type of easement present here. For example, in *Gibbens v. Weisshaupt*, 98 Idaho 633, 640, 570 P.2d 870, 877 (1977), the owner of a roadway easement, who was held to have "the right and duty to maintain, repair, and protect the easement," was required to fence off the roadway so that the "owner of the land subject to the easement should not be deprived of the use of his land as pasturage because of the existence of the easement." The Idaho Supreme Court added "It would seem proper in this case to require the respondent, the owners of the dominant estate, to absorb the cost of constructing and maintaining any gates necessary to protect the easement and to allow the appellants reasonable use of their land as pasturage." *Id.* However, the trial judge's order in the present case went beyond the holding in *Gibbens*.

In *Gibbens*, requiring the owner of the easement to fence the easement was consistent with the owner's clear-cut legal duty to "protect the easement" from cattle. *See also City of Bellevue v. Daly*, 14 Idaho 545, 94 P. 1036 (1908). However, in the present case we are not shown such a clear-cut legal duty on the part of Adams to support the judge's order. The installation of the drainage ditch on the Adams' property, the installation of the headgate in the community ditch where the ditch entered the Penrods' property, and the construction by Merrill of the dike along the Merrill-Penrod boundary, all appear to be reasonable, well-meaning efforts to solve the problems among neighbors in an amicable way. There is no question, as the trial court found, that these efforts were successful in minimizing the burden to the Penrods' servient property from waste irrigation water and surface water flowing

from the Adams and Merrill properties. However, we are not shown on the present record that this affords us a legal basis for upholding the trial judge's order.

If it were shown that Adams' or the Merrills' irrigation practices were unnecessarily wasteful, then it would afford the trial court legal grounds for requiring the irrigators to curtail such practices. Regardless of how long such practices had continued, or whether easements had been acquired to discharge certain volumes of water across a lower property, those wasteful practices would contravene the public policy of this state. That policy "is to secure the maximum use and benefit, and least wasteful use, of its water resources." *Poole v. Olaveson*, 82 Idaho 496, 502, 356 P.2d 61, 65 (1960). However, here the district court found that the Merrills and Adams "have conducted their irrigation practices on their land in a reasonable and farmerlike manner." Therefore, we must presume that such practices were not "wasteful." From the foregoing analysis we are constrained to hold that the district court's order requiring Adams to maintain the drainage ditch along her northern boundary must be vacated.

## V

The Merrills also cross-appeal to challenge the district court's order that the Merrills maintain a dike along their common boundary with the Penrods to prevent wase water from flowing across that boundary onto the Penrod parcel. The court did *not* conclude that an easement for this flow had been established. The Merrills assign this as error, contending an easement by prescription had been established. However, we cannot find in the record on appeal any indication that the district court was asked to determine that the Merrills had acquired such an easement. Nor does the evidence show what the extent of such an easement would be, if in fact it existed. Accordingly, the failure of the district court to hold that the Merrills had acquired an easement to discharge waste irrigation water across their eastern boundary below the community ditch was not error.

Finally, the Merrills contend that the court erred in finding the Merrills were negligent in permitting the dike to be breached in 1981. We are not convinced this was error, but even if it were, the error was harmless, because no damages were proven to have resulted. Accordingly, we will not discuss it further.

## VI

The final issues we will discuss concern the damages awarded the Merrills as a result of Penrod damming the community ditch. The Penrods first argue that the damage to the Merrill parcel was caused by water leaking from the wooden pipe located on the Adams parcel. They contend that this water, which flowed into the community ditch on the Merrills' property, was neither surface water nor irrigation waste water. Because the district court found that prescriptive easements were established only for surface water and irrigation waste water, the Merrills allegedly had no right to discharge this water through the community ditch onto the Penrod parcel. Thus, the damming of the ditch did not infringe upon the Merrills' rights and they cannot claim damages from the Penrods. We can not agree with the Penrods' view of the situation.

The evidence shows that the leaky pipe on Adams property was owned and used by some unidentified third party to convey water across the Adams property. There was no evidence to show that either Adams or the Merrills had any duty to maintain the pipeline. Richard Adams admitted that he took no action to notify the owner of the pipe about the leak because Adams could, and did, use this extra water during irrigation season. It was not shown that the Merrills even knew that some water flowing into the community ditch from the Adams parcel was coming from the leaky pipe, if in fact this was the case. If the Penrods were being damaged by this unwanted flow in the winter time, their complaint should have been directed to the

**56**

owner of the pipe, and to Adams, but not to the Merrills. Certainly the Penrods had no right simply to dam the community ditch and thus force the unwanted water to flow out over the Merrill parcel. The Merrills were equally innocent parties. We turn now to the question of the Merrills' damages.

 The Penrods argue that the district court applied an incorrect measure of those damages. Citing *Smith v. Big Lost River Irrigation District*, 83 Idaho 374, 364 P.2d 146 (1961), they contend that the correct measure of damages when land has been temporarily injured is the diminution in the rental value of the property or the cost of restoring the land to its former condition. *See also Bradford v. Simpson*, 97 Idaho 188, 541 P.2d 612 (1975). Here, the Merrills offered proof showing their yields of two annual hay crops were halved because of the flooding. In awarding damages on the basis of this proof, the district court correctly applied the well-established rule set forth by our Supreme Court in *Casey v. Nampa and Meridian Irrigation District*, 85 Idaho 299, 304, 379 P.2d 409, 411 (1963):

> the measure of damages for injury to a growing crop is the difference between the value of the crop actually raised upon the land and the crop which would have been raised upon it under normal conditions for the year in question, less the cost of maturing, harvesting and marketing such additional portion of the crop,— the difference in value between the probable yield and the actual yield, less the probable cost of placing the additional crop in a marketable condition and marketing it.

*See also Wing v. Hulet*, 106 Idaho 912, 684 P.2d 314 (Ct.App.1984). We find no error. Furthermore, the evidence, though conflicting, supports the damages awarded by the court. We will not overturn the award on appeal.

We have examined the other arguments of all parties, including the issues surrounding the alleged Thompson easement, and find that the district court's findings and conclusions are supported by the record. The judgment is affirmed in part and vacated in part. We remand for further proceedings. Costs to respondents, the Merrills and Adams. No attorney fees awarded on appeal.

WALTERS, C.J., concurs.

BURNETT, J., concurs in result.