# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 48363

JOE and NANCY CHESTER, Husband and Wife; JOE D. AND NANCY L. CHESTER FAMILY TRUST,

    Plaintiffs-Appellants,

v.

WILD IDAHO ADVENTURES RV PARK, LLC,

    Defendant-Respondent.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, February 2022 Term

Opinion filed: October 31, 2022

Melanie Gagnepain, Clerk

Appeal from the District Court of the Seventh Judicial District of the State of Idaho, Custer County. Steven Boyce, District Judge.

The order of the district court is <u>affirmed in part</u>, <u>reversed in part</u> and <u>remanded for further proceedings</u>.

Sawtooth Law Offices, PLLC, Boise, for Appellant. David P. Claiborne argued.

Smith Woolf Anderson & Wilkinson, PLLC, Idaho Falls, for Respondent. Marty R. Anderson argued.

_____

ZAHN, J.

This case concerns the scope of a statutory ditch right-of-way, whether a prescriptive easement can be obtained for overspray from an irrigation pivot, and whether a license agreement may bind succeeding property owners. For the reasons below, we affirm in part, reverse in part and remand the case for further proceedings.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Background

#### 1. History of the property

Prior to 1971, Ray and Gladys Laverty owned all the property that is the subject of this matter. Over time the Lavertys conveyed three portions of the property to others. During the litigation, the parties referred to those properties as parcels 1, 2, and 3. Parcel 1 is currently owned by an individual not involved in these proceedings. Between 1971 and 1981, the Lavertys

1

conveyed parcels 2 and 3 to Aldo Bevilaqua. Bevilaqua later conveyed the parcels to Dolly Smith, who later conveyed the parcels to Wild Idaho, the current owner.

The Lavertys eventually deeded their remaining property to their daughter, Nancy Chester, including the land bordering Bevilaqua's property on the east side. Nancy, in turn, transferred an interest in the property to her husband, Joe Chester. In 1999, Nancy and Joe deeded their respective interests in the property to the Joe D. and Nancy L. Chester Family Trust.

The location of the respective properties is identified on a Google Earth image submitted to the district court in connection with these proceedings. This Court modified the image to transfer markings from other exhibits to identify boundaries and the location of other items relevant to this appeal. The image thus consists of an exhibit submitted in the case, to which we have added additional information from other exhibits to depict the location of parcels and items discussed in this opinion.



Chester Property

License Agreement
Culvert

Bevilaqua Shop
Building

South Ditch

North Ditch

Parcel 1

Parcels 2 & 3
Wild Idaho Property

**Key**

Parcel 1 =

Wild Idaho Property =

Chester Property =

Chester Ditch =

Open ditch =

2.  The ditches and subsequent development of the properties

Historically, the Lavertys flood irrigated their property. However, in the fall of 1999 a pivot irrigation system was constructed on the land now owned by the Chesters. The pivot was designed to intentionally spray water onto parcels 2 and 3 to maximize the irrigation coverage on the Chesters' property. Irrigation water for that pivot (and for flood irrigation before it) is delivered to the Chesters' property from the Gini canal through a series of ditches. The Gini canal is located on one side of Highway 93, and the Chesters' property is on the other. A small lateral ditch branches off the Gini canal, crosses under Highway 93, and then emerges on the east side of the highway within parcel 1. Shortly after entering parcel 1, the ditch branches into two channels—the "North ditch" and the "South ditch." Those ditches then enter parcels 2 and 3, Wild Idaho's property. All told, there was approximately 310 feet of open ditch on Wild Idaho's property.

Parcels 2 and 3 are subject to a ditch easement provided for in a deed executed between the Lavertys and Bevilaqua in 1986 (the "Confirmation Deed"). The Lavertys and Bevilaqua executed and recorded the Confirmation Deed to correct defects in the legal descriptions of the parcels conveyed to Bevilaqua. Relevant to these proceedings, the confirmation deed provided that the Lavertys and their successors in interest

> Sav[ed] and Reserve[ed] . . . the right to continue the use and maintenance of those certain ditches and ditch rights of way upon or running across the described property. Grantee may, however, install pipe or culverts in place of any of the existing ditches so long as the pipe or culvert is at least 18 inches in width and installed in a satisfactory manner so as to not impede water flow through the ditches.

There is no dispute that the Chesters are the Lavertys' successors in interest with respect to the ditch easement discussed in the Confirmation Deed.

As concerns Bevilaqua's use of parcels 2 and 3, during the time he owned the property he made several improvements, including constructing a shop building roughly six feet from the centerline of the South ditch and installing a septic system. An eight-inch diameter sewer line, ostensibly placed by Bevilaqua, crosses the South ditch before connecting to the septic system. The sewer line crossing the South ditch services the entirety of Wild Idaho's RV park.

In 2009, Dolly Smith, another former owner of parcels 2 and 3, installed a ten-inch diameter culvert in a portion of the North ditch. The Chesters disagreed with the size of the pipe and executed and recorded a license agreement with Smith to govern the installation of a new culvert. Nancy testified that "[t]he reason this license agreement was drawn up is because we asked [the]

4

Smiths to remove the pipe and they could install an 18-inch one, and we did not want any further questions or disagreements about what size the [pipe] had to be in the ditch."

The license agreement incorporates multiple attachments, including a hand-annotated map of the property. Pursuant to the agreement, the licensee has the right to modify the Chester's ditch, and "encroach upon" the ditch easement, as provided for in Exhibit C to the agreement. Exhibit C, in turn, states that the purpose of the license agreement is to "permit the Licensee to . . . [i]nstall culvert pipes in Chester's [sic] ditch in the locations shown on Exhibit B." Exhibit B is a satellite image of the property with hand-drawn lines showing the course of the ditches, the portions of the ditches currently piped through culverts, and the section of the North ditch proposed to be buried in a culvert under the license agreement. The proposed location of the culvert licensed by the agreement appears to be a short portion of the North ditch just before it reaches the boundary with the Chesters' property. The license agreement also states that

> [t]he covenants, conditions, and agreement herein contained shall constitute covenants to run with, and running with, all of the lands of the Licensee . . . and shall be binding on each of the parties hereto and on all parties and all persons claiming under them or either of them, and the advantages hereof shall inure to the benefit of each of the parties hereto and their respective successors and assigns.

3. <u>Disputes between the Chesters and Wild Idaho</u>

In October 2016, Wild Idaho purchased parcels 2 and 3. The relationship between Wild Idaho's owner, Kyle Arneson, and the Chesters quickly soured. Various disputes between the parties led to Arneson restricting the Chesters' access to Wild Idaho's property in the spring of 2017. In August 2017, the Chesters had their attorney send a demand letter to Wild Idaho. The letter related to three issues between the parties: (1) the Chesters claimed they had an access easement through Wild Idaho's property via a gate in a boundary fence separating Wild Idaho's and the Chesters' property; (2) the Chesters claimed that Wild Idaho had placed encroachments within their ditch easement that needed to be removed; and (3) that Arneson had negligently damaged the boundary fence by plowing snow on it and keeping pigs next to the fence. In the spring of 2018, the Chesters replaced the entire boundary fence between their property and Wild Idaho's at a cost of $7,506.20 and sent a demand letter to Wild Idaho requesting reimbursement for one half of the cost of the new fence. Wild Idaho refused the demand. The Chesters subsequently filed suit against Wild Idaho.

5

## B. Procedural History

The Chesters' complaint raised four counts: (1) reimbursement of fence replacement costs; (2) quiet title to an access easement; (3) quiet title to a ditch easement; and (4) negligence for damaging the banks of the Chesters' ditches. Wild Idaho answered and counterclaimed, asserting claims of nuisance and trespass against the Chesters for water sprayed from their irrigation pivot onto Wild Idaho's property. The Chesters answered the counterclaim, asserting, as pertinent here, an affirmative defense that they had a prescriptive easement for "incidental irrigation water across" Wild Idaho's property. The Chesters then filed an amended complaint, adding a claim that Wild Idaho had breached the license agreement with the Chesters. Wild Idaho answered and filed an amended counterclaim (irrelevant to these proceedings) and a second amended counterclaim, adding claims of destruction of property for the Chesters' removal of the old boundary fence and quiet title, which requested the district court remove, as a cloud on the title to its real property, a "Notice of Right-Of-Way" that the Chesters recorded against Wild Idaho's property in 2019. At some later point that is not depicted in the record on appeal, it appears that Wild Idaho asked the district court to also remove from its title to the real property the license agreement between the Chesters and Dolly Smith, which the Chesters recorded against the property in 2009.

The district court held a two-day bench trial beginning January 22, 2020. At the outset of trial, the Chesters stipulated to dismiss their negligence claim and breach of license agreement claim with prejudice. However, they noted that the dismissal of their breach of license agreement claim would not preclude them from future actions for breach of the license agreement if the district court determined that the agreement was enforceable. At the conclusion of trial, the district court requested both parties to submit proposed findings of fact and conclusions of law for its consideration.

On May 4, 2020, the district court issued its findings of fact and conclusions of law. Pertinent to this matter, the district court's findings and conclusions addressed the scope of the Chesters' ditch easement, Wild Idaho's counterclaims for trespass and nuisance, and Wild Idaho's counterclaim for quiet title.

The district court made the following conclusions with respect to the ditch easement: (1) the easement would be twenty feet wide, extending ten feet on either side of the ditches' centerlines; (2) absent an emergency blockage, the Chesters could use a backhoe to clean the ditches on a triennial schedule beginning in 2020; (3) the Chesters were required to provide ten

6

days' written notice to Wild Idaho prior to conducting ditch maintenance on the property, unless there was an emergency; (4) Wild Idaho was not required to remove preexisting encroachments, but the Chesters could remove encroachments in the future if they unreasonably interfered with ditch maintenance; and (5) the Chesters could temporarily place spoils[1] within the ditch easement but they must remove them within a reasonable period of time.

Next, the district court concluded that overspray from the Chesters' irrigation pivot onto Wild Idaho's property was both a private nuisance and a trespass. In reaching these conclusions, the district court rejected the Chesters' affirmative defense that they had obtained a prescriptive easement for the overspray, concluding that overspray of water from an irrigation pivot is not a use of land for which a prescriptive easement could be obtained.

Finally, as to Wild Idaho's quiet title counterclaim, the district court concluded that the license agreement between the Chesters and Smith was an unreasonable cloud on Wild Idaho's title and ordered it to be removed. The district court concluded that the license agreement was unenforceable because (1) it was not supported by additional consideration; (2) a license agreement does not pass with the title to real property and therefore its obligations did not bind Smith's successor-in-interest; and (3) the agreement was freely revocable by the Chesters and therefore was not an interest in property.

Wild Idaho moved the district court to alter or amend its order based on a typographical error that created ambiguity with respect to the size of the ditch easement. Wild Idaho also asserted that the district court erred in not granting Wild Idaho mandatory damages, including attorney fees, for its trespass claim pursuant to Idaho Code section 6-202. The Chesters moved the district court to reconsider its order, arguing that the district court erred in defining the scope of their easement, rejecting their prescriptive easement defense, and removing the license agreement as a cloud on Wild Idaho's title.

The district court heard oral argument on the motions and issued oral rulings denying the Chesters' motion and granting Wild Idaho's motion in part. The district court found no reason to reconsider its previous order because it was consistent with Idaho Code section 42-1102 and Idaho case law. The district court granted Wild Idaho's motion to correct the typographical error in its

---

[1] The term "spoils" describes debris, soil, vegetation, or other material removed from a ditch as part of the maintenance process.

order and granted Wild Idaho's motion for damages under section 6-202, finding that the statute required at least a $500 damage award. The district court entered a final judgment on September 3, 2020.

Wild Idaho subsequently moved for attorney fees and costs pursuant to Idaho Code sections 6-202, 12-120(1), 12-121, and Idaho Rule of Civil Procedure 54. The Chesters opposed the motion, arguing that there was no prevailing party in the matter and that fees could not be apportioned under section 6-202 for Wild Idaho's success on the trespass claim.

The district court granted Wild Idaho's attorney fee request in part. The district court concluded that neither party prevailed as to the entire action, as both had prevailed in part. However, the district court concluded that section 6-202 mandated an award of attorney fees to a party who prevails in a trespass action under the statute, and apportioned attorney fees to Wild Idaho for its success on that claim.

The Chesters timely appealed.

## II.     ISSUES ON APPEAL

1. Did the district court err in defining the scope of the Chesters' ditch right-of-way under Idaho Code section 42-1102?

2. Did the district court err in denying the Chesters' affirmative defense of a prescriptive easement with respect to overspray of water from their irrigation pivot onto Wild Idaho's property?

3. Did the district court err in awarding Wild Idaho attorney fees related to its trespass claim?

4. Is either party entitled to attorney fees on appeal?

## III.     STANDARD OF REVIEW

This Court's "review of a trial court's conclusions following a bench trial is limited to determining whether the evidence supports the findings of fact and whether the findings of fact support the conclusions of law." *Burns Concrete, Inc. v. Teton Cnty.*, 168 Idaho 442, 456, 483 P.3d 985, 999 (2020). "The province of weighing conflicting evidence and testimony, and judging the credibility of witnesses, belongs to the trial court." *Latvala v. Green Enters., Inc.*, 168 Idaho 686, 694, 485 P.3d 1129, 1137 (2021) (citing *Borah v. McCandless*, 147 Idaho 73, 77, 205 P.3d 1209, 1213 (2009)). We liberally construe "the trial court's findings of fact in favor of the judgment entered." *Id.* (citing *Borah*, 147 Idaho at 77, 205 P.3d at 1213). A trial court's findings of fact will not be set aside unless they are clearly erroneous. *Id.*; *see also* I.R.C.P. 52(a)(7).

8

Factual findings are not clearly erroneous when they "are supported by substantial and competent, though conflicting, evidence." *Radford v. Van Orden*, 168 Idaho 287, 298, 483 P.3d 344, 355 (2021) (citing *Caldwell Land & Cattle, LLC v. Johnson Thermal Sys., Inc.*, 165 Idaho 787, 795, 452 P.3d 809, 817 (2019)). "Substantial and competent evidence exists if there is evidence in the record that a reasonable trier of fact could accept and rely upon in making the factual finding challenged on appeal." *Id.* (citing *Caldwell Land & Cattle, LLC*, 165 Idaho at 795, 452 P.3d at 817) (alterations omitted). "The substantial evidence standard for appellate review requires a greater quantum of evidence when the trial court's finding must be supported by clear and convincing evidence, than when mere preponderance is required." *Latvala*, 168 Idaho at 695, 485 P.3d at 1138.

This Court exercises free review over questions of law. *Id.* "Interpretation of a statute is a question of law." *Idaho Dept. of Health & Welfare v. McCormick*, 153 Idaho 468, 470, 283 P.3d 785, 787 (2012). "[W]hether the facts found, or stipulated to, are sufficient to satisfy the legal requirements for the existence of an implied easement or a prescriptive easement" is a question of law. *Backman v. Lawrence*, 147 Idaho 390, 394, 210 P.3d 75, 79 (2009) (citing *Davis v. Peacock*, 133 Idaho 637, 640, 991 P.2d 362, 365 (1999) *abrogated on other grounds by Spokane Structures, Inc. v. Equitable Inv., LLC*, 148 Idaho 616, 226 P.3d 1263 (2010)).

## IV. ANALYSIS

### A. The district court's order defining the scope of the Chesters' ditch right-of-way is affirmed in part and reversed in part.

1. The relationship between the Confirmation Deed easement and Idaho Code section 42-1102.

Although both parties and the district court appear to have considered the ditch easement in this case through the lens of section 42-1102, in actuality there are *two* easements relating to the ditches running through Wild Idaho's property.

First, there is the express easement set out in the Confirmation Deed, which reserves "the right to continue the use and maintenance of those certain ditches and ditch rights of way upon or running across the described property." Second, section 42-1102 entitles ditch owners "to a right-of-way through the lands of others, for a ditch, canal, or conduit to convey water to the place of use for the purposes of irrigation." I.C. § 42-1102(1). Further, section 42-1102(2) provides a non-exhaustive list of rights within the statutory right-of-way. A right-of-way is a type of easement. *Easement*, BLACK'S LAW DICTIONARY (11th ed. 2019).

9

The Court has previously held that rights contained in an express easement are not mutually exclusive with those enumerated in section 42-1102. In other words, "neither the provisions expressed in [an express easement] . . . nor [section 42-1102] operate to create a greater right . . . to the exclusion of the other." *Nampa & Meridian Irr. Dist. v. Wash. Fed. Sav.*, 135 Idaho 518, 522, 20 P.3d 702, 706 (2001). Thus, the Chesters have two easements: (1) the express easement created by the Confirmation Deed and (2) a statutory right-of-way created by section 42-1102. "[C]oncurrently existing easements may have different boundaries or scope[s.]" *Akers v. D.L. White Constr., Inc.*, 142 Idaho 293, 304 n.4, 127 P.3d 196, 207 n.4 (2005).

For the easement granted by the Confirmation Deed, the Chesters' rights would be measured by construing the Confirmation Deed "in connection with the intention of the parties and circumstances in existence at the time the easement was given and carried out." *Id.* at 304, 127 P.3d at 207 (citation omitted). In contrast, statutory right-of-way rights under section 42-1102 are defined by interpreting and applying the statute itself.

The parties have not drawn a distinction between the rights granted by the Confirmation Deed easement and those rights associated with the Chesters' statutory right-of-way under section 42-1102. To the extent the district court's decision purports to interpret and apply section 42-1102, we review the district court's analysis but note that the scope of the express easement in the Confirmation Deed has yet to be defined.

2. The district court's rulings are affirmed in part and reversed in part based on the Chesters' rights under section 42-1102.

The Chesters argue that the district court erred in interpreting Idaho Code section 42-1102 and limiting their rights granted by that statute. Specifically, they argue that the district court erred in setting the width of their right-of-way; restricting their use of a backhoe to maintain the ditches to a triennial schedule; restricting their right to place spoils within the right-of-way; forcing them to provide ten days' written notice for standard maintenance activities; and permitting two encroachments to remain in the right-of-way.

Following the district court's decision in this case, the Legislature amended section 42-1102. 2021 Idaho Sess. Laws 778. Wild Idaho concedes that the amended language does not require a ditch user to provide notice before utilizing a right-of-way, and therefore concedes that the portion of the district court's order requiring the Chesters to provide notice should be reversed. Wild Idaho maintains, however, that the district court's order was otherwise consistent with the statutory language.

10

The record on appeal reveals that neither the Chesters' Complaint nor their Amended Complaint mentioned Idaho Code section 42-1102. Rather, they claimed a prescriptive easement across Wild Idaho's property for the purpose of accessing their property, delivering irrigation water, and maintaining and repairing the ditch. Wild Idaho later conceded that the Chesters had an express easement, contained in the Confirmation Deed, to operate and maintain the ditches running across its property. Wild Idaho also advised that it disputed the scope of the easement. The district court's order interpreted and applied section 42-1102.

The parties' arguments on appeal focus entirely on the language of Idaho Code section 42-1102 and therefore require us to determine the scope of rights granted by that statute. "The objective of statutory interpretation is to derive the intent of the legislative body that adopted the act." *Nelson v. Evans*, 166 Idaho 815, 820, 464 P.3d 301, 306 (2020) (quoting *State v. Dunlap*, 155 Idaho 345, 361–62, 313 P.3d 1, 17–18 (2013)). To that end, we begin with the statute's literal language, giving the words their "plain, usual, and ordinary meanings." *Id.* We construe the statute as a whole, interpreting provisions in the context of the entire document. *Id.* This Court must construe a statute "to give effect to all the words and provisions . . . so that none will be void, superfluous, or redundant." *Id.* "If the statute is not ambiguous, this Court does not construe it, but simply follows the law as written." *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 893, 265 P.3d 502, 506 (2011).

Section 42-1102(2) enumerates a non-exclusive list of rights that are included in the statutory right-of-way:

> (2) The right-of-way for a ditch, canal, or other conduit shall include but is not limited to the reasonable exercise of the following rights:
>
> (a) The right to enter the land across which the right-of-way extends for the purposes of accessing, inspecting, operating, cleaning, maintaining, and repairing the ditch, canal, conduit, embankments, and irrigation structures, and to occupy such width of the land along the ditch, canal, conduit, and embankments as is necessary to properly perform such work with personnel and with such equipment as is commonly used or is reasonably adapted to that work.
>
> (b) The right to remove from the ditch, canal, conduit, embankments, and irrigation structures the debris, soil, vegetation, and other material the ditch, canal, or conduit owner or operator reasonably deems necessary to properly access, inspect, operate, clean, maintain, and repair them. The owner or operator has the right and discretion to transport the material from the right-of-way, to utilize the material for reconstruction, repair, or maintenance of the ditch, canal, conduit, embankments, irrigation structures, and related roads and access areas, and to deposit and leave the material within the right-of-way, provided that the

11

deposits occupy no greater width of land along the ditch, canal, conduit, and embankments than is reasonably necessary.

(c) The right to occupy the right-of-way during any season of the year to perform the work of operating, cleaning, maintaining, and repairing the ditch, canal, conduit, embankments, and irrigation structures, without prior notice to the owner or occupant of the land across which the right-of-way extends.

(d) The owner or operator of the ditch, canal, or conduit is not obligated to maintain or control the right-of-way or vegetation for the benefit of the owners or claimants of lands of others.

We recently held in *Hood v. Poorman*, __ Idaho __, __ P.3d __ (2022), that a statutory ditch right-of-way consists of two components, which must be separately addressed and defined. The first component, the primary easement, consists of the physical dimensions of the ditch itself and must be set forth in a judgment specifically describing its dimensions and location. *Id.* at __, __ P.3d at __ (citing *Argosy Trust ex rel. Andrews v. Wininger*, 141 Idaho 570, 572, 114 P.3d 128, 130 (2005)). The second component, the secondary easement, primarily concerns "what maintenance activities an easement holder may conduct, and to the extent a secondary easement has a defined physical dimension, it is tethered to the amount of space reasonably necessary to accomplish a particular maintenance activity at that time." *Id.* (citing *Ruddy-Lamarca v. Dalton Gardens Irr. Dist.*, 153 Idaho 754, 758, 291 P.3d 437, 441 (2012)). The scope of a secondary easement may vary over time and is particular to the maintenance right being exercised. *Id.* (citing *Ruddy-Lamarca*, 153 Idaho at 757-58, 291 at 440-41).

Section 42-1102(2) grants ditch users broad discretion to make maintenance decisions. Indeed, ditch users bear considerable responsibility to properly maintain their ditches and are exposed to both civil and criminal liability for failing to do so. *See* I.C. § 42-1102(3); I.C. §§ 42-1201 to -1204; I.C. § 18-4302. However, a ditch user's discretion in performing ditch maintenance is not unfettered, as the statute's plain language limits those maintenance rights to "reasonable exercise." *Id.* The "rule of reasonableness" with respect to irrigation ditches is well established and entitles a servient estate owner "to make uses of the property that do not unreasonably interfere with the dominant estate owner's enjoyment of the easement." *See Ruddy-Lamarca v. Dalton Gardens Irr. Dist.*, 153 Idaho 754, 757–58, 291 P.3d 437, 440–41 (2012) (citing *Nampa & Meridian Irr. Dist.*, 135 Idaho at 522, 20 P.3d at 706). Correspondingly, the dominant estate owner has a "duty to minimize the impact of its enjoyment of the easement upon the servient estate." *Id.* (citing *Gorrie v. Weiser Irr. Dist.*, 28 Idaho 248, 253, 153 P. 561, 562 (1915)). The rule of

reasonableness extends to secondary easement rights. *Id.* at 757, 291 P.3d at 440; I.C. § 42-1102(2) (requiring maintenance rights to be reasonably exercised).

Application of the rule of reasonableness does not, however, allow a trial court to impose limitations on a ditch user's maintenance decisions absent a determination that the ditch owner acted unreasonably. Assessing reasonableness is a highly fact-specific endeavor, and hinges on the particular circumstances of a given ditch and user. *See Ruddy-Lamarca*, 153 Idaho at 757 n.4, 291 P.3d at 440 n.4 (discussing the intricacies of ditch maintenance and how distinct reaches of the same ditch may require maintenance through varying means). Objective reasonableness must be demonstrated through competent evidence from those experienced in the field. *See Morgan v. New Sweden Irr. Dist.*, 156 Idaho 247, 254, 322 P.3d 980, 987 (2014). This includes evidence from the ditch user as to what is reasonable under the circumstances. *See id.* (accepting testimony from an irrigation district employee as to the reasonable area necessary to maintain canal banks). Finally, because any limits on the exercise of secondary easement rights are necessarily in the form of injunctive relief, before imposing any limitations on the ditch user the district court must also determine that the moving party has made a sufficient showing of threatened or actual irreparable injury. *Hood*, __ Idaho at __, __ P.3d at __. With this standard in mind, we address whether the district court properly defined the scope of the Chesters' statutory right-of-way under section 42-1102.

> a.  *The district court's decision setting the width of the Chesters' right-of-way at twenty feet is reversed and the matter remanded for further proceedings.*

The Chesters argue that the district court's order setting the width of the right-of-way at twenty feet is contrary to section 42-1102(2)(a) because it does not provide sufficient space for them to conduct necessary maintenance activities. They assert that the district court's order did not account for the width of the ditches' channels, the ditches' banks, or the space occupied by spoils, and accordingly resulted in a ditch right-of-way that was too narrow to accommodate necessary maintenance activities. Further, they contend that the district court's order did not provide any allowance for the Chesters to turn maintenance vehicles around after patrolling the length of the ditch. The Chesters suggest that a reasonable width for the right-of-way would be at least twenty-four feet in addition to a reasonable allowance to turn vehicles around at the end of the ditch. However, the Chesters ultimately contend that this Court should reverse the district court's decision and remand the matter "to provide no limit as to the width" of the right-of-way and instead

allow the Chesters to occupy any width of land they deem necessary to properly complete ditch maintenance work.

Wild Idaho argues that the district court's order regarding the easement's width did not violate section 42-1102(2)(a) because the district court's factual findings concerning the equipment necessary to maintain the ditch are supported by substantial and competent evidence. Further, Wild Idaho contends that the district court's factual findings support its legal conclusion that twenty feet was an adequate amount of space to complete necessary maintenance activities.

The district court found that Joe maintained the ditches with a backhoe by straddling the backhoe's wheels on either side of the ditch and working his way down the ditch. The district court also found, based on testimony from Joe and Nancy, that the backhoe they used to maintain the ditches is approximately thirteen feet, six inches wide with its outriggers extended. Finally, the district court found that the Chesters also used a propane trailer and fire suppression equipment pulled by a tractor to conduct controlled burns of the ditch banks. Based on these findings, the district court concluded that a twenty-foot easement, measuring ten feet on either side of the ditch from the centerline of the channel, was a reasonable amount of space to conduct necessary maintenance activities on the ditch.

As discussed above, the statutory ditch right-of-way consists of two parts: the primary easement and the secondary easement. *Hood*, __ Idaho at __, __ P.3d at __. The primary easement consists of the physical dimensions of the easement itself, and the district court must describe the dimensions and location of the easement in its judgment. *Id.* The secondary easement includes the space necessary to exercise the maintenance rights identified in section 42-1102(2), the scope of which may vary depending on the maintenance conducted and the conditions on the ground. *Id.* Before imposing limits on the Chesters' secondary easement rights, including the amount of space that the Chesters could occupy to perform maintenance, the district court was required to make two findings: (1) that the Chesters had unreasonably exercised their secondary easement rights; and (2) that Wild Idaho had made a showing of threatened or actual irreparable injury in the event limitations were not imposed on the Chesters' exercise of their secondary easement rights. *Id.*

In this case, the district court's order and judgment setting the width of the easement at twenty feet encompassed both the Chesters' primary easement and the area within which the Chesters could exercise their secondary easement rights. Given the framework described above, a remand is necessary for the district court to: (1) correct its order and judgment to describe the

14

purpose, length, width and location of the primary easement, and (2) consider and rule on Wild Idaho's request that the district court limit the area within which the Chesters exercise their secondary easement rights.

b. *The district court erred in limiting the Chesters' use of a backhoe and placement of spoils.*

The Chesters next contend that the district court erred in limiting their use of a backhoe to maintain the ditches to no more than once every three years, unless there was an emergency, and also erred in requiring them to remove spoils from the easement within a reasonable time after completing ditch maintenance. They argue the district court's order on these points conflicts with the express language of section 42-1102(2)(a) and (2)(b).

Wild Idaho contends that the district court's order is based on substantial and competent evidence because Joe testified that he did not need to use the backhoe to clean the ditch more than once every three years or so. Further, Wild Idaho notes that the district court's order allowed the Chesters to access the ditch with the backhoe in case of an emergency, and that they could access the ditches anytime to maintain them with hand tools. Wild Idaho contends that the district court reasonably restricted the Chesters' ability to deposit and leave spoils in the ditch easement after considering evidence that the Chesters had previously left excessive spoils in their easement. Wild Idaho states that the right to deposit spoils in a ditch easement is not absolute and may be reasonably restricted.

On the backhoe use, the district court found that "use of a backhoe to clean the ditches is not required annually." In addition, the district court found that there was only about 310 feet of open ditches on the property, and most of the maintenance could occur by hand with a shovel. Accordingly, the district court limited the Chesters' use of a backhoe to maintain the ditches to a triennial schedule beginning in 2020. However, the district court also allowed the Chesters to use a backhoe at any time in the event of an emergency blockage.

There is only one paragraph in the district court's findings of fact and conclusions of law pertaining to spoils. The district court concluded that "the Chesters . . . are entitled to temporarily place debris and material within the easement incidental to maintaining the ditches as permitted by I.C. § 42-1102. Any such debris or material shall be removed after completion of maintenance within a reasonable time."

As previously discussed, before imposing limits on the Chesters' secondary easement rights, including the amount of space that the Chesters could occupy to perform maintenance, the

15

district court was required to make two findings: (1) that the Chesters had unreasonably exercised their secondary easement rights; and (2) that Wild Idaho made a showing of threatened or actual irreparable injury if limitations were not imposed on the Chesters. *Hood*, __ Idaho at __, __ P.3d at __. Here, the district court did not restrict the Chesters' backhoe use to a triennial schedule based on any finding that the Chesters' past backhoe use was unreasonable. Rather, the district court relied on Joe's testimony that he typically conducted maintenance with a backhoe every three to four years and concluded that use of a backhoe was not *required* annually. Similarly, the district court did not find that the Chesters had unreasonably placed spoils next to the ditch. Further, the district court did not find that Wild Idaho made a showing of threatened or actual irreparable injury if the Chesters were not enjoined. Because the district court restricted the Chesters' exercise of their secondary easement rights without making these required findings, we reverse this portion of the district court's order.

> c. *We reverse the district court's decision requiring the Chesters to provide ten days' written notice prior to conducting maintenance.*

The Chesters argue that the district court's requirement that the Chesters provide ten days' written notice before conducting ditch maintenance is clearly contrary to the terms of section 42-1102(2)(c). Wild Idaho concedes that section 42-1102, as amended in 2021, does not require a ditch owner to provide any notice to the servient estate holder before utilizing the ditch easement, and that the district court's order requiring the Chesters to provide ten days' written notice before conducting ditch maintenance is no longer valid. Given Wild Idaho's concession on appeal, we reverse the portion of the district court's order requiring the Chesters to provide written notice to Wild Idaho prior to maintaining the ditch.

> d. *The district court's decision to permit the encroachments to remain within the ditch easement is supported by substantial and competent evidence.*

The Chesters contend the district court erred in permitting the shop building and sewer line on Wild Idaho's property to remain within the ditch easement. They also note that the district court's order did not address a fence that crosses the ditch. The Chesters contend that these encroachments materially interfere with their use of the easement and must be removed pursuant to section 42-1102 or the common law. Further, they contend that if the shop building is allowed to remain, their easement needs to be correspondingly widened to allow maintenance vehicles to drive on the opposite side of the ditch.

16

Wild Idaho contends that the district court properly concluded that the shop building and septic line could remain in place because the Chesters failed to establish that either encroachment materially interfered with their easement. Wild Idaho argues that both the shop and sewer line have been in place for thirty or more years, and as such, this Court should apply the common law rule as opposed to section 42-1102. Finally, Wild Idaho argues that the Chesters failed to preserve their fence argument because it was not raised below.

The district court applied the common law rule for encroachments and concluded that the Chesters failed to demonstrate that either of the existing encroachments unreasonably impacted their ability to clean and maintain the ditches. Therefore, the district court declined to order either the shop or the sewer line to be removed.

Before we turn to the Chesters' argument concerning the shop and sewer line, we first note that we will not consider the Chesters' argument concerning the allegedly encroaching fence because the issue was not raised below. "This Court's longstanding rule is that it will not consider issues raised for the first time on appeal." *KEB Enterprises, L.P. v. Smedley*, 140 Idaho 746, 752, 101 P.3d 690, 696 (2004) (citation omitted).

*i. Issues relating to the shop and sewer line are governed by the common law.*

The parties' arguments on the shop and sewer line raise a preliminary question: what law governs the encroachments in the Chesters' ditch easement? The Chesters argue that section 42-1102 should govern, and under that statute Wild Idaho would need express written permission to have any encroachments within the ditch easement. However, the Chesters acknowledge that if the encroachments were in place before 2004, when section 42-1102 was amended to include language regarding encroachments, case law existing prior to that statute would govern. Wild Idaho contends that case law existing before the amendment to section 42-1102 should govern because the shop and the sewer line were both constructed by Bevilaqua, who owned the property prior to 2004.

Idaho Code section 42-1102(5) governs encroachments and provides:

Rights-of-way provided by this section are essential for the operations of the ditches, canals and conduits. No person or entity shall cause or permit any encroachments onto the right-of-way, including public or private roads, utilities, fences, gates, pipelines, structures, landscaping, trees, vegetation, or other construction or placement of objects, without the written permission of the owner or operator of the right-of-way, in order to ensure that any such encroachments will not unreasonably or materially interfere with the use and enjoyment of the right-of-way. *Encroachments of any kind placed in such right-of-way without express*

17

*written permission of the owner or operator of the right-of-way shall be removed at the expense of the person or entity causing or permitting such encroachment*, upon the request of the owner or operator of the right-of-way, *in the event that any such encroachments unreasonably or materially interfere with the use and enjoyment of the right-of-way.*

(emphasis added). The statute "shall apply to ditches, canals, conduits, and embankments existing on the effective date of this act, as well as to ditches, canals, conduits, and embankments constructed or existing after such effective date." I.C. § 42-1102(6). The statute's effective date was July 1, 2004. 2004 Idaho Sess. Laws 562. This Court has held that the preceding language "do[es] not apply to encroachments constructed before the effective date." *Morgan I*, 156 Idaho at 256, 322 P.3d at 989.

The district court found that both the shop building and sewer line were constructed by Bevilaqua while he owned what is now Wild Idaho's property. While the district court did not make a finding as to when Bevilaqua sold the property, it did find that by 1993 Bevilaqua did not own the property. Accordingly, we conclude that case law existing prior to the 2004 amendment to 42-1102 governs the potential removal of the shop and sewer line because the district court's findings indicate that those structures were in place prior to 2004.

> ii. *The district court did not err in concluding the Chesters had not presented sufficient evidence to justify removing the shop or sewer line.*

Neither party disputes that the shop and the sewer line encroach on the Chesters' easement. The shop is located approximately six feet from the center of the South Ditch, and the sewer line transects the ditch. Thus, the only issue is whether the Chesters carried their burden to show that those encroachments unreasonably interfered with their maintenance activities.

For encroachments in place before July 1, 2004, this Court has explained that:

> A servient estate owner is entitled to make uses of the property that do not unreasonably interfere with the dominant estate owner's enjoyment of the easement. This means that an easement holder gets relief upon a showing that he is obstructed from exercising privileges granted in the easement. Thus, an easement holder has the burden of showing unreasonable interference. If he meets that burden, then the servient estate must remove those encroachments.

*Morgan I*, 156 Idaho at 256, 322 P.3d at 989 (citing *Nampa & Meridian Irr. Dist. v. Wash. Fed. Sav.*, 135 Idaho 518, 522, 20 P.3d 702, 706 (2001)) (internal quotations and citations omitted).

"It is the province of the district judge acting as trier of fact to weigh conflicting evidence and testimony and to judge the credibility of the witnesses." *Nampa & Meridian Irr. Dist.*, 135

18

Idaho at 521, 20 P.3d at 705. Considering the district court's role as the trier of fact in a bench trial, this Court liberally construes factual findings in favor of the judgment entered. *Id.*

On appeal the Chesters rely on Nancy's trial testimony in asserting that they carried their burden to show that the shop and septic line unreasonably interfered with their easement. With respect to the shop, Nancy testified that the backhoe used to maintain the ditch could not travel down the center of the ditch near the shop because the stabilizing arms of the backhoe would hit the shop building. Nancy also testified that she had not maintained any of the ditches on Wild Idaho's property with the backhoe. However, she had observed Joe maintaining the ditches on Wild Idaho's property. Joe testified that he previously owned a smaller backhoe that was unable to straddle the ditch. Consequently, Joe had to clear the ditch from one side or the other, with the backhoe situated atop the spoils pile. He testified that using the smaller backhoe, he could only maintain the ditch from the side opposite the shop because there was not enough room to maneuver the backhoe around the shop. However, Joe testified that the backhoe he currently uses to maintain the ditch has the capability to straddle the ditch, and that he works his way up the ditch in that manner. Joe did not indicate whether the shop interfered with his maintenance of the ditch using his current, larger backhoe.

As concerns the sewer line, the only evidence in the record about how it may interfere with the Chesters' ditch easement is testimony from Nancy. When asked why she had concerns with the sewer line, she stated

> [t]he pipe is about 4 inches above the bottom of the ditch so when you have debris come down the ditch such as leaves, branches, trees, it hangs up on that pipe, and if anybody does irrigation at all when debris hangs up on something, it tends to back the ditch up and flood the neighbors, and the neighbors aren't very happy when they get water scattered all over.

It is unclear whether Nancy's statement refers to an event that actually happened, or a hypothetical problem with the sewer line. Joe did not testify concerning the sewer line. Further, the Chesters did not present any other evidence that debris got caught by the sewer line or caused flooding.

Although the district court's analysis was brief, the district court's finding that the Chesters did not carry their burden to demonstrate that the shop and septic line unreasonably interfered with their easement is supported by substantial and competent evidence. It is evident from the district court's order that it generally did not find the Chesters' testimony to be credible, stating "[a]s a general observation the Court notes that testimony provided by the Chesters and Nancy in particular was generalized and conclusory." Liberally construing the facts found in favor of the

19

judgment entered, the district court did not err in rejecting the Chesters' claim that the shop unreasonably interfered with their easement. While Nancy stated she had observed Joe maintaining the South ditch from the side as opposed to the center because he could not navigate the backhoe around the shop, Joe's testimony contradicted that statement insofar as he stated that the shop was a problem with the previous backhoe but did not indicate it was a problem with the current one. Further, Nancy's statements that the sewer line *could* catch debris and cause a blockage are speculative and belied by the Chesters' failure to present evidence that the sewer line had ever caused such a blockage in the approximately twenty to thirty years since it was installed. Accordingly, we affirm the district court's decision determining that the Chesters did not carry their burden to show that the shop or sewer line unreasonably interfered with their ditch easement.

**B. The district court erred in denying the Chesters' prescriptive easement defense to Wild Idaho's nuisance and trespass claims.**

The Chesters argue that the district court erred in rejecting their claim that they had acquired a prescriptive easement to irrigation water overspray from their pivot onto Wild Idaho's property. They contend that the district court incorrectly concluded that spraying irrigation water onto another's land is not a "use" such that a prescriptive easement can be obtained for the practice. Finally, they contend that Idaho law recognizes that a prescriptive easement can be acquired for a private nuisance.

The district court found, and no one disputes, that water from the Chesters' irrigation pivot sprays approximately sixteen feet over the partition fence between Wild Idaho's and the Chesters' property. The district court also found that the pivot had been installed in November 1999 and that Joe had intentionally designed the pivot irrigation system to overspray onto Wild Idaho's property to "maximize coverage" of the pivot system on the Chesters' property. Accordingly, the district court concluded that the Chesters had created a private nuisance and the overspray from the Chesters' irrigation pivot constituted a civil trespass under Idaho Code section 6-202, reasoning that water was an object within the meaning of the statute and that the Chesters had deliberately caused the water to enter Wild Idaho's property.

As an affirmative defense to the nuisance and trespass claims, the Chesters asserted that they had acquired a prescriptive easement for the overspray of water onto Wild Idaho's property. The district court rejected the Chesters' prescriptive easement defense, reasoning that Idaho law does not recognize prescriptive easements for causing surface water to unnaturally flow onto neighboring properties and that overspray was not a "use" of property for which the Chesters could

20

obtain a prescriptive easement. We conclude that the district court erred when it rejected the Chesters' prescriptive easement defense.

      1.   <u>The natural servitude doctrine does not apply to irrigation pivot overspray.</u>

The district court erred by applying the wrong legal standard to the Chesters' prescriptive easement claim. In concluding that the Chesters could not obtain a prescriptive easement for overspray from their irrigation pivot, the district court applied the natural servitude doctrine. "Idaho's jurisprudence adheres to the civil law rule . . . which recognizes a natural servitude of natural drainage between adjoining lands so that the lower owner must accept the surface water which naturally drains onto his land." *Roberts v. Jensen*, 167 Idaho 838, 845, 477 P.3d 892, 899 (2020) (quoting *Lemhi Cnty.*, 163 Idaho at 411, 414 P.3d at 233) (internal quotation marks omitted).

The servitude recognized by the natural servitude doctrine is different than a prescriptive easement for unnatural surface waters discharged onto another's land. *See Lemhi Cnty.*, 163 Idaho at 408–11, 414 P.3d at 230–33 (first discussing whether an uphill owner had a prescriptive easement to discharge waste irrigation water into a drainage, then discussing whether the natural servitude doctrine permitted the same practice); *see also Roberts*, 167 Idaho at 945, 477 P.3d at 899 ("While an easement is a kind of servitude, a *natural servitude* is not the same as an easement.") (emphasis in original). An easement is a legal right to use land owned by another. In contrast, the natural servitude doctrine is a judicial acknowledgment of the laws of nature: that water flows downhill, and lower landowners must accept that inexorable truth as it pertains to naturally occurring waters. Indeed, this Court's case law discussing the natural servitude doctrine has not foreclosed the possibility that a landowner may obtain a prescriptive easement for the discharge of water that would be prohibited under the natural servitude doctrine. *See Loosli v. Heseman*, 66 Idaho 469, 478, 162 P.2d 393, 397 (1945) (providing analysis on the natural servitude doctrine, then addressing whether the appellant had acquired a prescriptive easement for the excess flow of waste water); *Dayley v. City of Burley*, 96 Idaho 101, 103–04, 524 P.2d 1073, 1075–76 (1974) (applying the natural servitude doctrine to water discharged from storm drains into a dry creek bed and also stating that no prescriptive right had been obtained because the statutory period had not elapsed prior to the action being commenced). In short, the district court erred because the natural servitude doctrine is distinct from a prescriptive easement.

Further, there are two reasons why the natural servitude doctrine is inapplicable to the irrigation pivot overspray in this case: (1) a pivot irrigation system is not a natural conveyance of water and (2) the Chesters are the downhill property owners, so they could not assert the doctrine to spray water onto uphill property because water does not naturally flow in that direction. *See Roberts*, 167 Idaho at 845, 477 P.3d at 899 (noting that the natural servitude doctrine only applies to *natural drainage* flowing across the land of a downhill property owner). Having determined the district court erred in relying on the natural servitude doctrine to dismiss the Chesters' defense, we next turn to the question of whether irrigation pivot overspray is a "use" for which a property owner may obtain a prescriptive easement.

2. A prescriptive easement can be obtained for irrigation pivot overspray.

The Chesters argue that if overspray from an irrigation pivot can constitute a trespass or nuisance, as the district court concluded, it is also a "use" for which a prescriptive easement can be obtained. They analogize to a farmer who, wanting to plow the maximum amount of her own property, uses her neighbor's property to turn her tractor around. They contend that their overspray of irrigation water onto Wild Idaho's property is no different than the farmer's use of her tractor, and they should therefore also be able to obtain a prescriptive easement. They also note that Idaho recognizes prescriptive easements for irrigation water overflow.

Wild Idaho draws on cases applying the natural servitude doctrine and states that a prescriptive easement cannot be obtained for the unnatural casting of surface water onto another's property. Further, Wild Idaho argues that Idaho has rejected the notion that a property owner can obtain a prescriptive easement for a private nuisance.

"The rule is well established that no use can be considered adverse or ripen into a right by prescription unless it constitutes some actual invasion or infringement of the rights of the owner." *Simmons v. Perkins*, 63 Idaho 136, 144, 118 P.2d 740, 744 (1941). "The state of mind of the users of the alleged easement is not controlling; the focus is on the nature of their use." *Akers*, 142 Idaho at 303, 127 P.3d at 206. Although Idaho has not specifically addressed the extent to which a use must infringe on an owner's rights to be adverse, the general rule appears to be that an adverse use is "one that creates a cause of action by the owner against the person claiming the prescriptive easement; no prescriptive easement may be created unless the person claiming the easement proves that the owner could have prevented the wrongful use by resorting to the law." 25 AM. JUR. 2d. *Easements and Licenses* § 45 (2022); *see also* Jon W. Bruce & James W. Ely, Jr., THE LAW OF

22

EASEMENTS & LICENSE IN LAND § 5:8 (2021) ("A use is adverse if it gives rise to a cause of action.") (collecting cases). While we have not explicitly stated the above principle in the prescriptive easement context, we have approved of it in the context of obtaining other prescriptive rights, like water rights. *Mountain Home Irr. Dist. v. Duffy*, 79 Idaho 435, 443, 319 P.2d 965, 969 (1957) ("The use of such water must be an invasion of the rights of the person against whom such right is sought to be established, such as would give a cause of action in favor of the latter."). Moreover, in *Hall v. Taylor*, although we did not discuss a cause of action, we recognized the following rule:

> An adverse right is not originated by consent but rather against the will and without the consent of the true owner, and generally rests on an original trespass, which matures into a property right by reason of the true owner allowing the claimant or trespasser to continue the adverse use and possession uninterruptedly and with assertion of right until the statutory period has run, which bars the true owner from either asserting or defending his right to the property.

57 Idaho 662, 668, 67 P.2d 901, 903 (1937); *see also Nw. & Pac. Hypotheekbank v. Hobson*, 59 Idaho 119, 124, 80 P.2d 793, 795 (1938) (applying the above rule to a prescriptive easement claim). Thus, we hold that if the use of another's land could give rise to a trespass action against the user, then the user can assert a claim against the landowner for a prescriptive easement.

Further, although Wild Idaho asserts that the Chesters' prescriptive easement defense is novel, the Court of Appeals addressed a somewhat similar circumstance in *Merrill v. Penrod*, 109 Idaho 46, 704 P.2d 950 (1985). There, the Court of Appeals recognized a prescriptive easement for the discharge of waste irrigation water onto an adjacent property owner's land. *Id.* In that case, both natural and irrigation wastewater from two properties, the Merrills' and the Adamses', drained into a community ditch that terminated on Penrod's property. *Id.* at 49–50, 704 P.2d at 953–54. Penrod was unhappy with the amount of water being discharged onto his land by the community ditch and constructed an earthen dam across the ditch at his property line, resulting in flooding on the Merrills' property. *Id.* at 50, 704 P.2d at 954. The Merrills and Adamses filed an action to establish their rights to a prescriptive easement to discharge irrigation water into the community ditch. *Id.* The Court of Appeals affirmed the district court's conclusion that the Merrills and Adamses had established a prescriptive easement to discharge waste irrigation water into the community ditch because they had established that the discharge of that water met the five elements for a prescriptive easement. *Id.* at 51, 704 P.2d at 955.

23

Here, it is undisputed that excess water from the Chesters' irrigation pivot sprays over the property line onto Wild Idaho's land. Thus, like in *Merrill*, the Chesters are causing excess irrigation water to go onto Wild Idaho's property. While the irrigation water in *Merrill* came from flood irrigation, as opposed to a sprinkler, the general principle is the same—the parties used adjoining properties to effectuate the irrigation of their own. In *Merrill*, the parties historically allowed excess irrigation water to flow into a community ditch so their own land would not be inundated with water. In this case, the Chesters are using a portion of Wild Idaho's property to maximize the amount of land irrigated by their pivot. In any event, the Chesters' state of mind is not controlling; rather, this Court asks whether the nature of their use infringes on Wild Idaho's property rights. The answer to that question appears to be yes in light of Wild Idaho's trespass and private nuisance claims against the Chesters. Indeed, the district court's conclusion that the water from the Chesters' irrigation pivot constituted both a trespass and a nuisance belies its conclusion that spraying irrigation water onto Wild Idaho's property was not an adverse use.

Wild Idaho argues that we should affirm the district court's order because in *Moon v. North Idaho Farmers Ass'n*, 140 Idaho 536, 544, 96 P.3d 637, 645 (2004), this Court "rejected the right to maintain a nuisance as an easement." Wild Idaho misreads our decision in *Moon*. In *Moon*, this Court considered whether a newly enacted statute effectuated a taking without just compensation because it immunized grass farmers who burnt their fields from private suits for trespass or nuisance. 140 Idaho at 539–40, 96 P.3d at 640–41. The statute in question provided that crop residue burning conducted in accordance with statutory provisions would not constitute a nuisance or trespass. *Id.* The plaintiffs, who had filed claims for nuisance and trespass against farmers for the smoke and particles that invaded their property as a result of the annual burning of grass fields, argued that the statute effectuated a taking because it essentially gave the grass farmers an easement to maintain a trespass and nuisance. *Id.* The district court concluded that the right to maintain a nuisance is an easement, relying in part on section 451 of the Restatement of Property. *Id.* at 543, 96 P.3d at 644. That provision reads "An affirmative easement entitles the owner thereof to use the land subject to the easement by doing acts which, were it not for the easement, he would not be privileged to do." *Id.* (quoting Restatement of Property § 451 (1944)). The comment to section 451 clarifies that the owner of an easement is allowed to intrude on land subject to the easement in a manner that would make her a trespasser if not for the easement and take actions on

24

her own property that would constitute a nuisance if not for the easement. *Id.* (citing Restatement of Property § 451 cmt. (1944)).

On appeal, this Court declined to adopt section 451 of the Restatement of Property. *Id.* at 543, 96 P.3d at 644. Further, this Court declined to hold that the "nuisance immunity provision" of the statute created an easement and noted that there was no direct authority in Idaho holding that the right to maintain a nuisance is an easement. *Id.*

The facts and holding in *Moon* are distinguishable from the facts and legal issues in this case. *Moon* was a regulatory takings case and held that the immunizing of farmers from claims for nuisance and trespass did not constitute such a taking. One of the arguments advanced by the *Moon* plaintiffs was that the statute effectively created an easement for the farmers to spread smoke and debris across the plaintiffs' property and thereby constituted a taking of the plaintiffs' property. The holding of *Moon* rejected this argument and determined that the statute did not create an easement on the plaintiffs' property. Neither party in this case has asserted a regulatory taking or otherwise asserted that government action effectively created an easement across Wild Idaho's property. These differences render our holding in *Moon* inapplicable to this case.

Further, contrary to Wild Idaho's implication, this Court did not hold in *Moon* that an easement cannot be obtained for conduct that would constitute a nuisance or trespass. In fact, such a holding would entirely negate the legal rights granted by easements. "An easement is the right to use the land of another for a specific purpose that is not inconsistent with the general use of the property by the owner." *Latvala v. Green Enterprises, Inc.*, 168 Idaho 686, 696, 485 P.2d 1129, 1139 (2020). Our recognition of easements and the rights granted thereby includes the recognition that an easement holder may, acting in conformance with the scope of the easement, engage in activities that may otherwise constitute trespass or nuisance in the absence of the easement.

The question presented in this case is whether the Chesters can obtain a prescriptive easement for the irrigation pivot overspray and assert that easement as an affirmative defense to Wild Idaho's claims for trespass and nuisance. For the reasons discussed above, we conclude they can. Accordingly, we hold the district court erred in rejecting the Chesters' prescriptive easement defense and we vacate the district court's judgment on this issue and remand for further proceedings.

25

**C. The district court did not err in striking the license agreement as an unreasonable cloud on Wild Idaho's title.**

The Chesters argue the district court erred in striking the license agreement because: (1) there was consideration for the license agreement, and (2) the license agreement was intended to bind successors and assigns pursuant to Idaho Code section 42-1207.

1. <u>The district court did not err in concluding the license agreement was unenforceable.</u>

The Chesters argue that although Wild Idaho's predecessor, Dolly Smith, "had a right to place culverts by virtue of the ditch easement in its Confirmation Deed," the license agreement was enforceable because it was supported by additional consideration and constituted the written permission necessary to pipe the ditches pursuant to Idaho Code section 42-1207. The Chesters contend that the changes in the rights and obligations of the parties is evidenced by the license agreement's indemnity provisions and the elimination of an eighteen-inch diameter limitation for any installed culvert.

Wild Idaho argues there is no additional consideration because Smith already had the right to install culverts within the ditch easement under the Confirmation Deed. Additionally, Wild Idaho asserts that the indemnification provisions do not amount to consideration because they "strip the statutory protections away from Ms. Smith [and] cause her to assume duties Chesters would otherwise have." Further, Wild Idaho argues that the license agreement is illusory because the Chesters reserved the right, at their option, to remove the culvert and if removal occurred, the Chesters retained the right to indemnification and attorney fees.

The district court determined that because "Smith already had the right to install culverts by virtue of the ditch easement under the Confirmation Deed," there was no additional consideration to support the enforceability of the license agreement. Further, the district court determined that the license agreement was not an interest in property because the license agreement was freely revocable by the Chesters. The district court ordered that the license agreement be stricken because the agreement was an unreasonable cloud on Wild Idaho's title.

"A contract must be supported by consideration to be enforceable." *Davidson v. Soelberg*, 154 Idaho 227, 232, 296 P.3d 433, 438 (Ct. App. 2013). "Where there is an exchange of mutual promises, there is no lack of consideration." *Profits Plus Cap. Mgmt., LLC v. Podesta*, 156 Idaho 873, 891, 332 P.3d 785, 803 (2014). Further, "a promise to do, or the doing of, what one is already bound by contract to do, is not a valid consideration." *Dashnea v. Panhandle Lumber Co.*, 57 Idaho 232, 238, 64 P.2d 390, 393 (1937).

The Confirmation Deed to Smith provides that the "Grantee may . . . install pipe or culverts in place of any of the existing ditches so long as the pipe or culvert is at least 18 inches in width and installed in a satisfactory manner so as to not impede water flow through the ditches." In 2009, the Chesters executed a license agreement that governed the installation of a new culvert on Smith's property because the previous culvert Smith used was less than eighteen inches. At trial, Nancy testified to the following:

> Q: So, Nancy, this license agreement, was that prepared at your request?
>
> A: It was.
>
> Q: And was that based upon the fact that you contended they installed too small of a culvert on the ditch?
>
> A: The reason this license agreement was drawn up is because we asked Smiths to remove the pipe and they could install an 18-inch one, and we did not want any further questions or disagreements about what size the type [sic] had to be in the ditch. So we had this drafted up and Dolly signed it. We didn't have any issues with her not signing it.

The license agreement permitted the installation of a culvert at a specific location that appears to be a short portion of the North ditch just before the Chesters' property line. Specifically, the license agreement stated its purpose was to protect the Chesters' right

> to control modifications or alterations of [their] watercourses and [their] right of way along [their] watercourses, and protect [their] right to control the manner of maintenance and repair of [their] watercourses and [their] right of way along [their] watercourses.

Exhibit D, titled "Special Conditions," described the conditions with which Smith had to comply, providing in pertinent part:

> Any culverts placed according to the terms of this license shall have an inside diameter that is sufficient to accommodate the quantity of water historically delivered through the ditch.

The license agreement established certain consequences if Smith failed to comply with the conditions and granted the Chesters the right to remove any installation that did not comply with the terms of the agreement at Smith's expense.

Finally, the license agreement includes various indemnity and hold harmless provisions that the Chesters characterize as "agreements to hold each other harmless." Yet, the language of those provisions shows that the indemnity and hold harmless provisions unilaterally benefited the Chesters, as each indemnity and hold harmless provision begins with the language "[Smith] agrees to indemnify, hold harmless, and defend Chester[.]"

It is unclear what consideration the Chesters provided for the license agreement. Smith made a variety of one-side promises to the Chesters' benefit, including the indemnity provisions, hold harmless provisions, and agreeing to allow the Chesters to remove any of the work performed under the agreement at her expense, among others. On the other hand, to the extent the Chesters promised to allow Smith to place a culvert in the ditch so long as it was at least eighteen inches in diameter, Smith already had that right under the Confirmation Deed. "It is well established 'that a promise to do, or the doing of, what one is already bound by contract to do, is not valid consideration'" *Shore v. Peterson*, 146 Idaho 903, 909 n.6, 204 P.3d 1114, 1120 n.6 (2009). The parties entered into the license agreement after Smith had violated the eighteen-inch requirement in the Confirmation Deed, and as Nancy testified, the intent of the agreement was to ensure that Smith complied with the eighteen-inch requirement. Even if Nancy's testimony could be construed as a promise to forgo litigation over the Smith's installation of an undersized culvert in exchange for a promise from Smith to abide by the eighteen-inch requirement, there was no consideration because Smith was already bound to abide by that requirement. While there was no explicit measurement requirement in the license agreement, the special conditions provision required Smith to sufficiently accommodate the quantity of water historically delivered through the ditch. As such, the Chesters did not grant Smith any rights or benefits beyond those she already possessed by virtue of the Confirmation Deed. Accordingly, we affirm the district court, as it did not err in determining that the license agreement was not valid because it was not supported by mutual consideration.

## D. The district court's award of attorney fees is vacated in light of our holding on the Chesters' prescriptive easement defense.

The Chesters argue that the district court abused its discretion in awarding attorney fees to Wild Idaho for its trespass claim. They contend that the district court improperly parsed the prevailing party determination on a claim-by-claim basis and abused its discretion in awarding fees to Wild Idaho on its trespass claim even though Wild Idaho did not prevail with respect to the entire action. Since we have vacated the district court's judgment so it can make findings and conclusions on the Chesters' prescriptive easement defense, we also vacate the district court's award of attorney fees to Wild Idaho for its prevailing on that claim. As a result, we do not reach the merits of the Chesters' argument concerning the district court's award of attorney fees on Wild Idaho's trespass claim.

28

**E. Neither party is entitled to attorney fees or costs on appeal.**

    1. <u>The Chesters are not entitled to attorney fees or costs on appeal.</u>

The Chesters request attorney fees and costs on appeal pursuant to paragraph 11 of the license agreement or under Idaho Code sections 6-202(3)(c), 12-107, 12-114, 12-119, or 12-121 if this Court concludes that Wild Idaho pursued this action frivolously, unreasonably, or without foundation.

For the reasons stated above, the license agreement is unenforceable. As such, the Chesters cannot rely on it for an attorney fee award or costs. With respect to the Chesters' statutory attorney fees and costs claims, the Chesters have waived those claims because they have not provided argument or authority to support them. "[A]bsent any legal analysis or argument, 'the mere reference to [a] request for attorney fees is not adequate.'" *Johnson v. Murphy*, 167 Idaho 167, 176, 468 P.3d 297, 306 (2020) (quoting *Goldman v. Graham*, 139 Idaho 945, 948, 88 P.3d 764, 767 (2004)). The Chesters merely provide a list of five statutes and assert they are entitled to attorney fees and costs if this Court concludes Wild Idaho acted frivolously, unreasonably, or without foundation. They do not provide analysis as to why Wild Idaho acted frivolously, unreasonably, or without foundation. Further, several of the statutes cited by the Chesters provide no basis for an award of attorney fees or costs. Accordingly, we decline to award attorney fees on appeal to the Chesters.

    2. <u>Wild Idaho is not entitled to attorney fees or costs on appeal.</u>

Wild Idaho requests attorney fees under Idaho Code sections 6-202 and 12-121 as well as costs as a matter of right under I.A.R. 41. Wild Idaho contends that this Court may apportion attorney fees under section 12-121 if it determines that some of the issues on appeal were pursued frivolously, unreasonably, or without foundation. Further, Wild Idaho argues that it is entitled to mandatory attorney fees under section 6-202 for prevailing on its trespass claim.

Wild Idaho is not entitled to attorney fees under section 6-202 because we reversed the district court's decision on its trespass claim, and it is yet-to-be determined if Wild Idaho will prevail following remand. Next, Wild Idaho is not entitled to apportioned attorney fees under section 12-121. An award of attorney fees to a prevailing party under section 12-121 is warranted when the non-prevailing party's position was frivolous, unreasonable, or without foundation. I.C. § 12-121. We do not find the Chesters' arguments fall into any of these categories. Consequently, we decline to award attorney fees on appeal to Wild Idaho.

Finally, we do not award costs to Wild Idaho under I.A.R. 41 because Wild Idaho has not prevailed on appeal. I.A.R. 41 requires a prevailing party, and where both parties prevail in part on appeal, this Court may determine that neither party has prevailed. *Hehr v. City of McCall*, 155 Idaho 92, 99, 305 P.3d 536, 543 (2013). Since both Wild Idaho and the Chesters have prevailed in part on appeal, we conclude that costs are not merited.

## V.     CONCLUSION

For the reasons stated above, we affirm in part and reverse in part the district court's order, and remand for further proceedings. Neither attorney fees nor costs are awarded on appeal.

Chief Justice BEVAN, Justices BRODY, STEGNER and MOELLER **CONCUR**.